# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-12-00306-CV

**Stanley Bacon, Jr., Appellant**

**v.**

**Texas Historical Commission, Appellee**

## FROM THE DISTRICT COURT OF TRAVIS COUNTY, 345TH JUDICIAL DISTRICT
## NO. D-1-GN-11-002927, HONORABLE RHONDA HURLEY, JUDGE PRESIDING

## O P I N I O N

Although the heroism and sacrifice of forebears are never far from the minds of her citizenry, Texas has nonetheless accorded special emphasis to certain of these persons and their deeds through the placement of thousands of state government-approved historical markers, known today as "Official Texas Historical Markers." While these markers can vary somewhat in appearance, they uniformly convey to the reader an often-fascinating array of historical facts that can range from the merely colorful to the inspiring, and in either case provide a good excuse to pause whatever one is doing long enough to stop and read them. But what if, upon absorbing the content of one of these Official Texas Historical Markers, a reader is struck by a factual assertion that, according to his or her own personal knowledge, experience, or expertise, is dubious or just flat-out wrong?

This appeal arises from such a disagreement about the accuracy of facts presented in an Official Texas Historical Marker. However, this Court is called upon not to decide whose version of history is correct, but the extent to which the Texas judiciary has jurisdiction to intervene in that

debate in the first place. Under the circumstances presented here, at least, we conclude that the dispute must instead be resolved—if it even can be resolved by any instrumentality of our state government—within the Legislative or Executive branches.

## BACKGROUND

### The "Official Texas Historical Marker" program

Although our 1876 Texas Constitution has specifically empowered the Legislature to "make appropriations for preserving and perpetuating memorials of the history of Texas,"[1] and there have been other subsequent Texas state-government-sanctioned initiatives to erect memorial or historical markers,[2] the current program of state government-sanctioned "Official Texas Historical Markers" appears to trace back to the birth of the agency that now oversees them, the agency known today as the Texas Historical Commission (THC), appellee here. In 1953, the Fifty-Third Legislature created, by concurrent resolution—and without any accompanying appropriation of funds—an eighteen-member "Survey Committee" and directed it to conduct a comprehensive study of "the preservation and dissemination" of historic Texas writings, structures, sites, and articles.[3] With this, the Legislature directed the Committee "to act as a coordinating agency and . . . supply statewide leadership in the encouragement and stimulation of" activities that included "[p]reservation

---

[1] Tex. Const. art. 16, § 39.

[2] E.g., the stone or concrete historical markers that were erected in connection with the 1936 Texas Centennial.

[3] *See* Tex. S. Con. Res. 44, 53d Leg., R.S., 1953 Tex. Gen. Laws 1087; *see also* Tex. S. Con. Res. 28, 54th Leg., R.S., 1955 Tex. Gen. Laws 1675 (authorizing the Committee to continue its study).

and designation of historic houses, sites, and landmarks."[4]  A few years later, the Fifty-Fifth Legislature reconstituted the "Texas State Historical Survey Committee" as a full-fledged state agency, with rule-making power, "for the purpose of providing leadership and coordinating services in the field of historical preservation.[5] The Committee's specific charges included "giv[ing] direction and coordination to the state historical marker program," although the nature of this program was not defined or further described in the statute.[6]

At the agency's inception, the Legislature emphasized that its delegated "purpose [is] to give leadership, coordination and service where it is needed and where it is desired," "not . . . to duplicate or replace existing historical heritage organizations and activities," and that it "shall exercise no authority over any organization, agency, or institution of the state."[7]  However, in 1963, the Legislature made an exception to these limitations by amending the Committee's enabling statute

---

[4]  Tex. S. Con. Res. 44, 53d Leg., R.S., 1953 Tex. Gen. Laws 1087.

[5]  Act of May 17, 1957, 55th Leg., R.S., ch. 500, § 1, 1957 Tex. Gen. Laws 1460, 1460–01.

[6]  *Id.* § 9, 1957 Tex. Gen. Laws at 1462.  Similarly, the Legislature directed the new agency to continue a collaborative effort with the State Building Commission that had begun a few years earlier.  The State Building Commission had been created by a constitutional amendment that authorized it to, among other things, expend funds on the erection of memorials to Texans who served in the armed forces of the Republic of Texas or of the Confederacy.  *See* Tex. S.J. Res. 10, 53d Leg., R.S., 1953 Tex. Gen. Laws 1172, 1172–73 (amending Article III of Texas Constitution by adding section 51-b).  The Legislature subsequently authorized the Building Commission "to negotiate and contract with the Texas Historical Survey Committee, created by the 53rd Legislature, for the purpose of assisting and advising the [Building] Commission with regard to the proper memorials and monuments to be erected, repaired, or relocated to new locations, the selection of sites therefor, and the location and marking of graves."  Act of June 6, 1955, 54th Leg., R.S., ch. 514, § 16, 1955 Tex. Gen. Laws 1298, 1301.  When later reconstituting the Texas State Historical Survey Committee as an agency, the Legislature directed it to "continue to assist and advise the State Building Commission with regard to proper memorials and monuments to be erected, repaired, and removed to new locations, and selection of sites thereof, and the location and marking of graves."  *See* Act of May 17, 1957, 55th Leg., R.S., ch. 500, § 9, 1957 Tex. Gen. Laws at 1462.

[7]  *See* Act of May 17, 1957, 55th Leg., R.S., ch. 500, § 12, 1957 Tex. Gen. Laws at 1462.

to authorize and direct the agency, "in order to assure a degree of uniformity and quality of historical markers, monuments, and medallions within the State of Texas," to "review, pass upon or reject the final form, dimensions, substance of and inscriptions or illustrations on any historical marker, monument, or medallion before its erection by any county, incorporated city, or the State Building Commission, within this state."[8]

A decade later, the Legislature repealed and reenacted the agency's enabling statute, changing the agency's name to the current "Texas Historical Commission,"[9] and not only directed it to "give direction and coordination to the state historical marker program," but specifically charged it with "the responsibility for marking districts, sites, individuals, events, structures, and objects significant in Texas and American history, architecture, archaeology, and culture, and keep[ing] a register thereof."[10] And, similar to the prior statute, THC was specifically empowered to "review, pass upon, or reject the final form, dimensions, text or illustrations on any marker, monument, or medallion before its fabrication by the state, or any county, county historical survey committee, incorporated city, individual, or organization within this state."[11] "The markers so approved," the act added, "shall be designated by [THC] as Official Texas Historical Markers."[12] Substantively identical language has remained a component of THC's enabling statute—now chapter 442 of the Government Code—to this day. *See* Tex. Gov't Code § 442.006(a)–(c).

---

[8] Act of May 8, 1963, 58th Leg., R.S., ch. 195, §§ 1–2, 1963 Tex. Gen. Laws 521, 521–22.

[9] *See* Act of May 17, 1973, 63d Leg., R.S., ch. 311, § 1, 1973 Tex. Gen. Laws 719; *see also* Act of Mar. 29, 1973, 63d Leg., R.S., ch. 38, § 1, 1973 Tex. Gen. Laws 56 (duplicative act that changed name of Texas State Historical Survey Committee to Texas Historical Commission).

[10] Act of May 17, 1973, at § 12, 1973 Tex. Gen. Laws at 720.

[11] *Id*.

[12] *Id.*

**The Mount Bonnell historical marker**

In 1969, the agency, still known then as the Texas State Historical Survey Committee, approved a new historical marker that was placed upon the Austin landmark long known as Mount Bonnell, where it still stands today near the base of the stairway that leads from the parking area to the summit. The Mount Bonnell historical marker is titled, simply, "Mount Bonnell," and, like many other such markers, consists of a metal plate or tablet in a shield-like shape, with silver lettering against a black or dark gray background, and has the agency's seal at the top. In addition to confirming that Mount Bonnell rises to 775 feet above sea level, the silver letters advise the reader that, inter alia, the legendary Texas Ranger "Bigfoot" Wallace once killed an "Indian" nearby, that a Mormon-built mill was once located on the Colorado River shoreline that bounds the mountain's western base, and that, in 1898, a Miss Hazel Keyes "slid down a cable" (perhaps an early-day version of a zip line) that stretched from the summit to the river's opposite shore.

Of more direct significance to this appeal, the marker also states that Mount Bonnell was named for a George W. Bonnell, who, the reader is further informed, "came to Texas with others to fight for Texas independence, 1836." The marker adds that this Mr. Bonnell eventually moved to Austin in 1839 (which many readers might remember as the year in which Texas's capitol city came into existence and development of the original fourteen-square-block grid began[13]), published a newspaper there in 1840, went on to participate in both the 1841 Santa Fe Expedition and the 1842 Mier Expedition (both ill-fated, as many readers will recall[14]), and was killed during the latter.

---

[13] *See, e.g.*, David C. Humphrey, "*AUSTIN, TX. (TRAVIS COUNTY)*," *Handbook of Texas Online*, http://www.tshaonline.org/handbook/online/articles/hda03, last visited on Aug. 19, 2013.

[14] *See, e.g.*, T.R. Fehrenbach, *Lone Star: A History of Texas and the Texans* 477–80 (Wings Books 1983) (1968); *see also* H. Bailey Carroll, "*TEXAS SANTA FE EXPEDITION*," *Handbook of Texas Online*, http://www.tshaonline.org/handbook/online/articles/qyt03 (last visited on

One might deduce from such factual assertions that the naming of the peak for George W. Bonnell, as represented in the Mount Bonnell historical marker, might have been a product of his presence in town during Austin's infancy, or of some prominence he acquired there as a newspaper publisher, or perhaps was some sort of recognition or honor for service or sacrifice for Texas. But as with the marker's placement near the first of the one-hundred-or-so steps leading upward to the Mount Bonnell summit's renowned views, its contents signal only the beginnings of a debate as to how that peak acquired its name.

**The dispute**

Appellant Stanley Bacon is a retired United States Army officer who lives in Austin. He is a graduate of the United States Military Academy at West Point and serves on the board of directors of an organization known as the West Point Society of Central Texas, which professes to represent hundreds of his fellow West Point graduates who now reside in the Austin area. For at least the past decade, Bacon and other Society members have devoted considerable efforts to drawing public attention to the life story of a fellow U.S. Army officer and West Point graduate, Class of 1825, whom they maintain played a critical though often-unsung role in winning Texas's independence from Santa Anna's Mexico. It happens that this U.S. Army officer from long ago had the surname of Bonnell—Joseph Bonnell.[15] And it was this *Joseph* Bonnell of early Texas—not the

_____

Aug. 19, 2013); Joseph Milton Nance, "*MIER EXPEDITION*," *Handbook of Texas Online*, http://www.tshaonline.org/handbook/online/articles/gym02 (last accessed on Aug. 19, 2013).

[15] Among other heroic acts that they attribute to him, Society members assert that Joseph Bonnell—whom they claim also held officer rank in the Texas army and was a close advisor and friend to General Sam Houston—single-handedly quelled a brewing uprising of the Caddo tribe that threatened General Houston's forces during the pivotal days leading up to the San Jacinto battle.

*George W.* Bonnell credited on the Official Texas Historical Marker—whom Society members believe was most likely the true namesake of Mount Bonnell.[16]

Compounding this slight to a true Texas military hero, in the eyes of Society members, is the marker's accompanying assertion that George W. Bonnell "came to Texas

---

[16] While not asserting that this Joseph Bonnell ever visited the Austin area, Society members maintain (to summarize a much more elaborate historical argument) that Mount Bonnell was nonetheless probably named for him by, or with the approval of, the Republic of Texas's Secretary of War, General Albert Sidney Johnston, or its Adjutant General, Hugh McLeod, sometime in 1839 or early 1840, while the two officials were overseeing the defensive measures necessary to secure what was then a frontier area while the new capitol city of Austin was being planned and built. They reason that Johnston or McLeod invariably would have given a name to this prominent and strategically important peak and would have been prone to so honor Joseph Bonnell because (1) this Bonnell was a longtime friend and military colleague of both men, and had been recently transferred out of the Texas region by the U.S. Army; and (2) this Bonnell had built a military service record that would tend to elicit such recognition. In contrast, while acknowledging that George W. Bonnell would subsequently acquire some local prominence that might have caused later historians to assume he was the peak's namesake, Society members attribute various facts to him that, in their view, make it unlikely that he was the original source: (1) George did not arrive in Austin until October 1839, and thus, in their view, would either have been absent or still an undistinguished newcomer at the time they believe Mount Bonnell was named; (2) as a militia commander, according to them, George had made a serious tactical blunder that led to the infamous Morgan massacre in January 1839; and (3) George had published a book in 1840, *Topographical Descriptions of Texas, to Which is Added an Account of the Indian Tribes*, in which he observes that "above the city of Austin is a high peak called Mount Bonnell," yet conspicuously makes no claim that the peak was named for him.

The Society has presented its research and advocacy regarding Joseph Bonnell to the public through a variety of means, including a website, *see West Point Society of Central Texas*, http://www.west-point.org/society/wps-centx/ (last visited Aug. 19, 2013), on which can be found a more complete presentation of its historical analysis. For authority espousing a more favorable view of George W. Bonnell and his contributions to Texas history, *see* L.W. Kemp, "*BONNELL, GEORGE WILLIAM*" *Handbook of Texas Online*, http://www.tshaonline.org/handbook/online/articles/rjm28 (last visited Aug. 22, 2013); *see also The Texas Republic, A Social and Economic History* 271 (Univ. of Tex. ed. 1969) (1946) (noting, among examples of "respected citizens" of the Republic who "were involved in altercations" reflected in its court records, that "Jefferson Wright and George W. Bonnell had two fistic encounters following Bonnell's insinuations that Wright was a coward and had 'resigned his Indian agency from fear,'" and adding that Wright had "dared Bonnell to a 3d contest before more than 300 people & abused him in the strongest manner.'") (quoting Letter from James Reily to Henry Raguet (Nov. 20, 1838)).

with others to fight for Texas independence, 1836." That statement, they insist, is at odds with an inconvenient historical truth—George, according to them, did not arrive in Texas until mid-*August* 1836, about four months after Texas had already won her independence at San Jacinto. Consequently, they urge, the marker appears to falsely credit George with fighting in the Texas Revolution, and that the only way it could be considered even technically or literally true (albeit still misleading) is if one construes it to mean that George traveled to Texas with the *motive* to fight in a revolution that he was somehow unaware had already ended four months earlier. Such an inference, they suggest, would be both dubious and—in purporting to recount George's subjective state of mind over a century earlier—founded on empty speculation.

**Proceedings before THC**

Starting not later than 2004, Society members, including Bacon, undertook efforts to persuade THC to approve a replacement or modification of the 1969 Mount Bonnell historical marker—at the Society's expense—to correct what they view as its erroneous attribution of the peak's name to George rather than Joseph Bonnell. The precise course of these proceedings before the agency is somewhat murky, however, because the complete administrative record was never brought forth from THC to the district court so as to be part of our record on appeal. On the other hand, Bacon did file, without objection from THC, certain excerpts from the administrative record as evidence in the district court. Consistent with our standard of review,[17] we have based the following summary of material events at the agency on the facts alleged in Bacon's live pleadings and the portions of the administrative record he filed in district court.

---

[17] *See infra* pp. 13–16.

At the inception of the Society's effort to have the Mount Bonnell marker changed or replaced, THC rules authorized "[a]ny individual, group, or county historical commission" to seek the agency's approval of a proposed historical marker by making application to the agency.[18] On behalf of the Society, Seldon B. Graham, Jr., a Society member and attorney who would later serve as Bacon's trial counsel in this case, prepared an application for a replacement Mount Bonnell marker that would have credited Joseph Bonnell rather than George Bonnell as the peak's namesake. The evidence reflects that this application was transmitted to THC through the Travis County Historical Commission (TCHC) under cover of a letter from its chair dated October 18, 2004. A copy of this letter is included in our record, although its enclosures are not. The letter also indicates that the TCHC chair included another enclosure, a "narrative" prepared by one of TCHC's members "contain[ing] new and updated information about George Bonnell." The letter further advises THC that TCHC members had considered these written materials, heard oral presentations from Graham and the TCHC member who had provided the new information about George Bonnell, and ultimately voted to recommend a change to the Mount Bonnell marker, but not the same one that the Society had proposed—specifically, "to recommend that the names of both George and Joseph be included on the Mount Bonnell marker."

Roughly a year later, on October 6, 2005, THC's executive director wrote Graham advising him of a decision not to change the Mount Bonnell marker. A copy of this letter is in the record. The letter states that after reviewing "your background information related to Mount Bonnell in Austin" (not in the appellate record), and after having "also consulted with a number of colleagues and historical organizations" and "weighing all the information," the agency staff "have

[18] 13 Tex. Admin. Code § 21.7 (2004) (THC, Application Requirements), *amended by* 31 Tex. Reg. 9599 (2006), *amended by* 37 Tex. Reg. 9494 (2012).

decided not to replace our marker." Bacon alleges, and THC acknowledges, that the agency did not conduct any sort of formal evidentiary hearing prior to this determination. The letter concludes by thanking Graham for his "enthusiasm for the life of Joseph Bonnell" and assuring him that "should we uncover any conclusive evidence in the future that the Austin landmark was named for him, we will certainly let you know."

The next administrative activity regarding the Mount Bonnell marker that is reflected in Bacon's pleadings or evidence occurred in August 2011. On August 22, 2011, Bacon submitted to THC a 25-page research paper prepared by another Society member, Frederick C. Bothwell, III, and titled, *Reconsidering the Historical Marker on Mount Bonnell*. This paper is included in the appellate record, along with affidavits from Bacon and Bothwell attesting to various facts relating to the paper's creation and use.[19] Bacon further pleads that Bothwell's *Reconsidering the Historical Marker on Mount Bonnell* contained "substantial new evidence" beyond the application and materials that Society members had previously submitted to the agency (and that are not in the record).

On the same date that Bacon alleges and avers that he filed *Reconsidering the Historical Marker on Mount Bonnell* with THC, a letter to Bacon issued from THC's executive director, on behalf of THC's chairman, advising Bacon of the agency's "final decision" declining to replace the Mount Bonnell historical marker. It elaborated:

> Although the evidence [submitted by Bacon and other Society members] is persuasive, we believe that it is at least equally possible that the mountain was named for George Bonnell, a local resident who had some standing in the community at that time.

---

[19] E.g., Bothwell avers that his paper was an expanded version of a 2009 article written by Graham and that Bothwell had additionally prepared two documentary videos on the subject.

The letter further elaborated that the TCHC, in what would have been a departure from its 2004 position, "continue to maintain that they want to keep the current marker in place." This was potentially significant because, during the intervening years, THC had amended its rules governing historical marker applications to impose new limitations that included requiring applicants to first obtain approval from the local county historical commission before proceeding to THC.[20] Accordingly, THC maintained that since the TCHC had not "request[ed] changes to the marker, or the placement of an additional marker," but instead "is satisfied," "this matter is concluded." THC added that "[t]here are more than 15,000 markers across Texas, and while we appreciate your enthusiasm for this single marker, our agency cannot dedicate more staff or commission time to this issue." Bacon alleges, and THC acknowledges, that the agency did not afford him a formal evidentiary hearing prior to this "final decision" (which, again, was issued on the same day that he had submitted *Reconsidering the Historical Marker on Mount Bonnell*).

On appeal, THC presents what purport to be copies of agendas and minutes from several years' worth of meetings of its commissioners and of a "History Committee" and urges that these documents are proof of intervening agency proceedings in which Society members advocated their position regarding the Mount Bonnell marker. Even if we were to consider these documents from outside the record,[21] they would, without more, be competent evidence only that the

---

[20] *See* 34 Tex. Reg. 1514, 1515 (2009), *adopted by* 34 Tex. Reg. 2949 (2009) (codified at 13 Tex. Admin. Code § 21.7 (THC, Application Requirements), *amended by* 37 Tex. Reg. 9494, 9495 (2012) (proposed Aug. 31, 2012).

[21] *See Sabine Offshore Serv., Inc. v. City of Port Arthur*, 595 S.W.2d 840, 841 (Tex. 1979) (noting that courts of appeals may not consider evidence outside the record); *Carlisle v. Philip Morris, Inc.*, 805 S.W.2d 498, 501 (Tex. App.—Austin 1991, writ denied) ("It is elementary that, with limited exceptions not material here, an appellate court may not consider matters outside the appellate record." (citing *Sabine*, 595 S.W.2d at 841)); *but see Rusk State Hosp. v. Black*, 392 S.W.3d 88, 94 (Tex. 2012) (citing *Texas Ass'n of Bus. v. Texas Air Control Bd.*, 852 S.W.2d

11

"Mount Bonnell Official Texas Historical Marker" was posted as a topic of discussion at a single meeting of the THC's History Committee on July 28, 2011, not necessarily that this had anything to do with Society members or their efforts to get the marker changed. In either event, these documents presented by THC on appeal are not material to our analysis.

**Proceedings in the district court**

On September 20, 2011, Bacon sued THC in the district court. His principal claim for relief was based on section 2001.171 of the Administrative Procedure Act (APA),[22] which waives sovereign immunity to the extent of permitting a party who has exhausted its administrative remedies and who is "aggrieved by a final decision in a contested case" to seek judicial review of that decision in the manner that the APA provides. *See* Tex. Gov't Code § 2001.171; *Texas Dep't of Protective & Regulatory Servs. v. Mega Child Care, Inc.*, 145 S.W.3d 170, 198 (Tex. 2004) (holding that APA section 2001.171 "provides a limited waiver of sovereign immunity"). Based on the premise that the proceedings before THC had been a "contested case" within the meaning of the APA, Bacon sought reversal and remand of the agency final decision based on multiple asserted grounds under APA section 2001.176, including that the decision was not reasonably supported by substantial evidence, that it was arbitrary and capricious, and that THC had not followed the trial-like procedures applicable to "contested cases." *See* Tex. Gov't Code § 2001.174 ("Review Under Substantial Evidence Rule"). In addition to his APA judicial-review claim, Bacon pled that THC had violated his due-process rights under the U.S. Constitution and "curtailed [his] liberty of speech"

_____

440, 445 (Tex. 1993) for proposition that jurisdictional issues, including sovereign immunity, may be raised for the first time on appeal).

[22] The APA is codified in chapter 2001 of the Government Code. *See* Tex. Gov't Code §§ 2001.001–.902.

under the Texas Constitution. *See* U.S. Const. amend. V (due process); Tex. Const. art. I, § 8 (freedom of speech).

THC interposed a plea to the jurisdiction, arguing that Bacon's claims were barred by sovereign immunity and that he had no standing to assert them. As previously noted, Bacon filed, without objection from THC, certain excerpts from the administrative proceedings and other evidence of those events. Following a hearing at which no further evidence was presented, the district court granted THC's plea and rendered judgment dismissing the case for want of subject-matter jurisdiction.

Bacon appeals that judgment.

## ANALYSIS

Bacon brings four issues on appeal, contending that the district court erred in concluding that it lacked subject-matter jurisdiction because, he urges, sovereign immunity did not bar his claims and he has standing to assert them. Alternatively, Bacon insists that the district court erred in dismissing the case without affording him an opportunity to replead.

**Standard of review**

A plea to the jurisdiction challenges a trial court's authority to decide the subject matter of a specific cause of action. *See Texas Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 225–26 (Tex. 2004). Whether this authority exists turns in the first instance on the content of the claimant's live pleadings. *Id.* at 226. The plaintiff has the initial burden of alleging facts that would affirmatively demonstrate the trial court's jurisdiction to hear the cause. *Id.* (citing *Texas Ass'n of Bus. v. Texas Air Control Bd.*, 852 S.W.2d 440, 446 (Tex. 1993)). Mere unsupported legal conclusions do not suffice. *See Creedmoor-Maha Water Supply Corp. v. Texas Comm'n on*

13

*Envtl. Quality*, 307 S.W.3d 505, 515–16 & nn. 7 & 8 (Tex. App.—Austin 2010, no pet.). We construe the pleadings liberally, taking them as true, and look to the pleader's intent. *Miranda*, 133 S.W.3d at 226. If the pleadings fail to allege sufficient facts to affirmatively demonstrate the trial court's jurisdiction but also fail to affirmatively demonstrate incurable defects in jurisdiction, the issue is one of pleading sufficiency, and the plaintiff should be afforded the opportunity to amend. *Id*. at 226–27. If, on the other hand, the pleadings affirmatively negate the existence of jurisdiction, then a plea to the jurisdiction may be granted without allowing the plaintiff an opportunity to amend. *Id*. at 227.

We may also consider evidence that the parties have submitted and must do so when necessary to resolve the jurisdictional issues. *Bland Indep. Sch. Dist. v. Blue*, 34 S.W.3d 547, 555 (Tex. 2000). In fact, in a plea to the jurisdiction, a party may present evidence to negate the existence of a jurisdictional fact alleged in the pleadings, which we would otherwise presume to be true. *Miranda*, 133 S.W.3d at 227; *Hendee v. Dewhurst*, 228 S.W.3d 354, 367 (Tex. App.—Austin 2007, pet. denied). How we review a trial court's explicit or implicit determination of such a challenge depends on whether the jurisdictional fact being challenged overlaps with the merits of the plaintiff's claims. If the challenged jurisdictional fact overlaps with the merits of the plaintiff's claims, the party asserting the plea to the jurisdiction must overcome a traditional-summary-judgment-like burden and conclusively negate that fact. *See Miranda*, 133 S.W.3d at 228; *Hendee*, 228 S.W.3d at 367. But if the challenged jurisdictional fact does not overlap the merits, the fact issue may be resolved by the trial court when resolving the jurisdictional issue, and its explicit or implicit fact finding (or failure-to-find) may be challenged in the same manner as fact findings generally. *Combs v. Entertainment Publ'ns, Inc.*, 292 S.W.3d 712, 719 (Tex. App.—Austin 2009, no pet.).

14

Our ultimate inquiry is whether the particular facts presented, as determined by the foregoing review of the pleadings and any evidence, affirmatively demonstrate a claim within the trial court's subject-matter jurisdiction. *See Miranda*, 133 S.W.3d at 226; *Creedmoor–Maha*, 307 S.W.3d at 513, 516 & n.8. That is a question of law that we review de novo. *See Miranda*, 133 S.W.3d at 226.

Resolution of this ultimate question frequently entails construction of statutes, which in itself presents a question of law. *See Texas W. Oaks Hosp., LP v. Williams*, 371 S.W.3d 171, 177 (Tex. 2012). When construing a statute, our primary objective is to ascertain and give effect to the Legislature's intent. *TGS-NOPEC Geophysical Co. v. Combs*, 340 S.W.3d 432, 439 (Tex. 2011). To discern that intent, we begin with the statute's words. *Id*. "Where text is clear, text is determinative of that intent." *Entergy Gulf States, Inc. v. Summers*, 282 S.W.3d 433, 437 (Tex. 2009) (op. on reh'g). The words cannot be examined in isolation, but must be informed by the context in which they are used. *TGS-NOPEC*, 340 S.W.3d at 441. We rely on the plain meaning of the words, unless a different meaning is supplied by legislative definition or is apparent from context, or unless such a construction leads to "absurd results." *See City of Rockwall v. Hughes*, 246 S.W.3d 621, 625–26 (Tex. 2008); *see also* Tex. Gov't Code § 311.011 ("Words and phrases shall be read in context and construed according to the rules of grammar and common usage," but "[w]ords and phrases that have acquired a technical or particular meaning, whether by legislative definition or otherwise, shall be construed accordingly."). We further presume that the Legislature chooses a statute's language with care, including each word chosen for a purpose, while purposefully omitting words not chosen. *In re M.N.*, 262 S.W.3d 799, 802 (Tex. 2008). We likewise attempt to give effect to all of a statute's words and avoid treating any language as surplusage if reasonable and possible. *See Marks v. St. Luke's Episcopal Hosp.*, 319 S.W.3d 658, 663 (Tex. 2010); *see also*

Tex. Gov't Code § 311.021(2) (presumption that entire statute is intended to be effective); *Texas Lottery Comm'n v. First State Bank of DeQueen*, 325 S.W.3d 628, 637 (Tex. 2010) ("Courts 'do not lightly presume that the Legislature may have done a useless act.'" (quoting *Liberty Mut. Ins. Co. v. Garrison Contractors, Inc.*, 966 S.W.2d 482, 485 (Tex. 1998))). Our analysis of the statutory text may also be informed by such matters as "the object sought to be attained," "circumstances under which the statute was enacted," legislative history, and "common law or former statutory provisions, including laws on the same or similar subjects," and the title of the provision. *See* Tex. Gov't Code § 311.023(1)–(4), (7). Similarly, we assume that when enacting a statute, the Legislature was aware of the background law and acted with reference to it. *See In re Allen*, 366 S.W.3d 696, 706 (Tex. 2012) (quoting *Acker v. Texas Water Comm'n*, 790 S.W.2d 299, 301 (Tex. 1990)). However, only when the statutory text is ambiguous "do we 'resort to rules of construction or extrinsic aids.'" *Entergy*, 282 S.W.3d at 437 (quoting *In re Estate of Nash*, 220 S.W.3d 914, 917 (Tex. 2007)).

**Jurisdictional limitations on suits challenging governmental action**

As THC emphasizes, Bacon's claims against THC could have invoked the district court's subject-matter jurisdiction only if he somehow overcame or avoided two fundamental limitations on the subject-matter jurisdiction of Texas state courts to entertain suits challenging governmental action: (1) sovereign immunity; and (2) constitutional standing requirements.

*Sovereign immunity*

Absent Legislative waiver, sovereign immunity deprives Texas courts of subject-matter jurisdiction over any suit against the State or its agencies or subdivisions. *See, e.g.*, *Texas Dep't of Transp. v. Sefzik*, 355 S.W.3d 618, 620–21 (Tex. 2011) (per curiam). That same immunity generally extends to Texas state officials who are sued in their official capacities because that "is

16

merely 'another way of pleading an action against the entity of which [the official] is an agent.'" *City of El Paso v. Heinrich*, 284 S.W.3d 366, 373 (Tex. 2009) (quoting *Texas A&M Univ. Sys. v. Koseoglu*, 233 S.W.3d 835, 844 (Tex. 2007) (quoting *Kentucky v. Graham*, 473 U.S. 159, 165 (1985))). Simply described, sovereign immunity generally shields our state government's "improvident acts"—however improvident, harsh, unjust, or infuriatingly boneheaded these acts may seem—against the litigation and judicial remedies that would be available if the same acts were committed by private persons. *See Tooke v. City of Mexia*, 197 S.W.3d 325, 331–32 (Tex. 2006).

Perhaps somewhat ironically here, the doctrine of sovereign immunity has its roots in the English common-law notion that no wrong could be done by royalty from whom the American military long ago liberated our People. *See id.* at 331 (noting that sovereign immunity has evolved over the centuries from the fiction that "the king can do no wrong" (citing William Blackstone, 3 *Commentaries on the Laws of England* 254 (1768)). Nonetheless, it was not long after the Texas Revolution that the Texas Supreme Court recognized the doctrine of sovereign immunity to be part of Texas's common law,[23] and the high court has continued to adhere to the doctrine to this day. However, its contemporary rationale derives not from the prerogative of royalty but from the tripartite form our democratic self-government has taken—namely, a view that the Legislature, not the Judiciary, is best suited to make the policy-laden judgments as to if and how state government resources should be expended. *See, e.g.*, *Sefzik*, 355 S.W.3d at 621 (citing *Texas Natural Res. Conservation Comm'n v. IT-Davy*, 74 S.W.3d 849, 854 (Tex. 2002)); *Tooke*, 197 S.W.3d at 331–32.[24] This principle of judicial deference embodied in sovereign immunity

---

[23] *See Hosner v. DeYoung*, 1 Tex. 764, 769 (1847).

[24] *See also* Tex. Const. art. II, § 1 ("The powers of the Government of the State of Texas shall be divided into three distinct departments, each of which shall be confided to a separate body

extends not only to the Legislature's choices as to whether state funds should be spent on litigation and court judgments versus other priorities, but equally to the policy judgments embodied in the constitutional or statutory delegations that define the parameters of an officer's discretionary authority and the decisions the officer makes within the scope of that authority. *See, e.g.*, *Sefzik*, 355 S.W.3d at 621 (citing *W.D. Haden Co. v. Dodgen*, 308 S.W.2d 838, 839 (Tex. 1958)); *Heinrich*, 284 S.W.3d at 372; *Director of Dep't of Agric. & Env't v. Printing Indus. Ass'n of Tex.*, 600 S.W.2d 264, 265 (Tex. 1980).

Consequently, sovereign immunity compels Texas courts to defer to the Legislature as the gatekeeper controlling when and how citizens can sue their state government or its officers for their official acts. *See Wichita Falls State Hosp. v. Taylor*, 106 S.W.3d 692, 695 (Tex. 2003) (noting that "the Legislature is better suited to balance the conflicting policy issues associated with waiving immunity") (citing, among other cases, *IT-Davy*, 74 S.W.3d at 854). The Legislature may consent to suits against the State by statute or resolution. *IT-Davy*, 74 S.W.3d at 853–54 (citing *General Servs. Comm'n v. Little-Tex. Insulation Co.*, 39 S.W.3d 591, 594 (Tex. 2001)). "Legislative consent to sue the State must be expressed in 'clear and unambiguous language.'" *Id.* at 854 (quoting Tex. Gov't Code § 311.034; *University of Tex. Med. Branch v. York*, 871 S.W.2d 175, 177 (Tex. 1994)).

However, under what is termed the "ultra-vires exception" to sovereign immunity, such immunity is not considered to be implicated by a suit against a state officer in his official capacity (thereby binding the State through its agent) for prospective injunctive or declaratory

---

of magistracy, to wit: Those which are Legislative to one; those which are Executive to another, and those which are Judicial to another; and no person, or collection of persons, being of one of these departments, shall exercise any power properly attached to either of the others, except in the instances herein expressly permitted.").

relief to compel compliance with statutory or constitutional provisions. *See Heinrich*, 284 S.W.3d at 372–80. Sovereign immunity is held not to bar such claims because, in concept, acts of state officials that are not lawfully authorized are not considered to be acts of the State, and the remedy of compelling such officials to comply with the law, while binding on the State, "do[es] not attempt to exert control over the state [but] attempt[s] to reassert the control of the state." *Id.* at 372. "Stated another way, these suits do not seek to alter government policy but rather to enforce existing policy." *Id*. But to come within the ultra-vires exception, the plaintiff "must not complain of a government officer's exercise of discretion, but rather must allege, and ultimately prove, that the officer acted without legal authority or failed to perform a purely ministerial act." *Id*. Otherwise, the suit implicates sovereign immunity because it seeks to "control state action," to dictate the manner in which officers exercise their delegated authority. *See id.*; *Creedmoor–Maha*, 307 S.W.3d at 515–16.

One implication of these principles is that there is no general right to challenge or seek review of a state agency order or decision in Texas state court; to the contrary, state agency decisions generally cannot be challenged in court unless the Legislature has enacted a statute expressly authorizing such review. *See Mega Child Care, Inc.*, 145 S.W.3d at 198; *Creedmoor-Maha*, 307 S.W.3d at 514.[25] However, sovereign immunity does not bar a suit to challenge or restrain an agency order or action that is beyond the agency's statutory or constitutional authority. *See Creedmoor-Maha*, 307 S.W.3d at 514–15 (citing *Texas Highway Comm'n v. Texas Ass'n of Steel Imps.*, 372 S.W.2d 525, 530 (Tex. 1963)); *see also Chemical Bank & Trust Co. v. Falkner*, 369 S.W.2d 427, 433 (Tex. 1963) ("When a vested property right . . . has been affected by the action

---

[25] Even then, there are constitutional constraints on the scope of that review. *See Gerst v. Nixon*, 411 S.W.2d 350, 353–54 (Tex. 1966); *Southern Canal Co. v. State Bd. of Water Eng'rs*, 318 S.W.2d 619, 622–24 (Tex. 1958).

19

of an administrative agency, thereby invoking the protection of due process of law, there is an inherent right of appeal.") (citing *Brazosport Sav. & Loan Ass'n v. American Sav. & Loan Ass'n*, 342 S.W.2d 747, 750 (Tex. 1961); *City of Amarillo v. Hancock*, 239 S.W.2d 788, 790 (Tex. 1951)).

### *Standing*

Even if sovereign immunity has been waived or would otherwise not be a bar to a suit to challenge governmental action, additional limitations on the subject-matter jurisdiction of courts are imposed by the Texas Constitution. These include the constitutional requirement of standing, which imposes certain threshold standards regarding the stake a plaintiff must possess in a dispute before a court can exercise subject-matter jurisdiction to resolve it. *See Texas Ass'n of Bus.*, 852 S.W.2d at 443–45. The general test for constitutional standing in Texas courts is whether there is a "real" (i.e., justiciable) controversy between the parties that will actually be determined by the judicial declaration sought. *See id.* at 446. Constitutional standing is thus concerned not only with whether a justiciable controversy exists, but whether the particular plaintiff has a sufficient personal stake in the controversy to assure the presence of an actual controversy that the judicial declaration sought would resolve. *See Patterson v. Planned Parenthood*, 971 S.W.2d 439, 442 (Tex. 1998); *Nootsie, Ltd. v. Williamson Cnty. Appraisal Dist.*, 925 S.W.2d 659, 662 (Tex. 1996). The requirement thereby serves to safeguard the separation of powers by ensuring that the judiciary does not encroach upon the executive branch by rendering advisory opinions, decisions on abstract questions of law that do not bind the parties. *See Texas Ass'n of Bus.*, 852 S.W.2d at 444.

Further, with regard to complaints about governmental action in particular, standing doctrines serve to prevent judicial incursions into abstract or generalized public policy disputes that are properly resolved in the other branches. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560,

20

576–78 (1992) (discussing role of standing requirements in preventing judicial incursions into legislative and executive spheres); *Brown v. Todd*, 53 S.W.3d 297, 302 (Tex. 2001) ("[W]e may look to the similar federal standing requirements for guidance."). They also "reflect in many ways the rule that neither citizens nor taxpayers can appear in court simply to insist that the government and its officials adhere to the requirements of law." *Andrade v. Venable*, 372 S.W.3d 134, 136–37 (Tex. 2012) (quoting *Andrade v. NAACP of Austin*, 345 S.W.3d 1, 7 (Tex. 2011) (quoting Charles Alan Wright et. al., *Federal Practice and Procedure* § 3531.10 (3d ed. 2008))). "Generally, 'a citizen lacks standing to bring a lawsuit challenging the lawfulness of governmental acts.'" *Id*. at 136 (quoting *NAACP*, 345 S.W.3d at 6). "This is because '[g]overnments cannot operate if every citizen who concludes that a public official has abused his discretion is granted the right to come into court and bring such official's public acts under judicial review.'" *Id.* (quoting *Bland*, 34 S.W.3d at 555).

"Unless standing is conferred by statute, a plaintiff must show that he has suffered a particularized injury distinct from the general public." *Id*. (citing *Bland*, 34 S.W.3d at 555–56); *see Brown*, 53 S.W.3d at 302 ("Our decisions have always required a plaintiff to allege some injury distinct from that sustained by the public at large."); *Tri County Citizens Rights Org. v. Johnson*, 498 S.W.2d 227, 228–29 (Tex. Civ. App.—Austin 1973, writ ref'd n.r.e.) ("It is an established rule . . . that '. . . sufficiency of a plaintiff's interest (to maintain a lawsuit) comes into question when he intervenes in public affairs. When the plaintiff, as a private citizen, asserts a public, as distinguished from a private, right, and his complaint fails to show that the matters in dispute affect him differently from other citizens, he does not establish a justiciable interest.'") (quoting 1 Roy W. McDonald, *Texas Civil Practice* § 3.03, at 229 (rev. vol. 1965)). That is, "a plaintiff must be personally aggrieved; his alleged injury must be concrete and particularized,

actual or imminent, not hypothetical." *DaimlerChrysler Corp. v. Inman*, 252 S.W.3d 299, 304–05 (Tex. 2008). More specifically, the "irreducible constitutional minimum" of standing consists of three elements:

(1)     "the plaintiff must have suffered an 'injury in fact'—an invasion of a 'legally protected' [or cognizable] interest which is (a) concrete and particularized and (b) 'actual or imminent, not conjectural or hypothetical'";

(2)     "there must be a causal connection between the injury and the conduct complained of"—the injury must be "fairly traceable" to the challenged action of the defendant and not the independent action of a third party not before the court; and

(3)     it must be likely, and not merely speculative, that the injury will be redressed by a favorable decision.

*Lujan*, 504 U.S. at 560–61; *see Brown*, 53 S.W.3d at 305; *Save Our Springs Alliance, Inc. v. City of Dripping Springs*, 304 S.W.3d 871, 878 (Tex. App.—Austin 2010, pet. denied).

**Jurisdiction over Bacon's claims**

With these limitations in mind, we now turn to Bacon's specific arguments as to why or how he invoked the district court's subject-matter jurisdiction nonetheless. In his first issue, Bacon argues that he invoked the district court's jurisdiction by asserting claims under a "private attorney general" provision of THC's enabling statute, section 442.012(a) of the Government Code. In his second issue, Bacon urges that he asserted claims within the ultra-vires exception to sovereign immunity by alleging conduct by THC that exceeded its authority. In his third issue, somewhat related to his second, Bacon maintains that THC violated his rights and exceeded its authority in various ways through the procedures it followed in denying his request or requests to change

the Mount Bonnell historical marker. In his fourth and final issue, Bacon insists that he invoked the district court's jurisdiction through his constitutional claims.

Before further exploring each of Bacon's contentions, we should make three threshold observations suggested by THC. First, Bacon—who is aided by new additional counsel on appeal—purports to have asserted several claims that he did not actually plead in his live petition before the district court. Bacon's live petition, as noted, asserted only an APA section 2001.171 judicial-review claim and his constitutional claims. Nonetheless, we will proceed to consider all of Bacon's current jurisdictional theories inasmuch as they would be relevant to, at a minimum, whether his claims would be susceptible to being repleaded in a manner that invoked the district court's jurisdiction. *See Miranda*, 133 S.W.3d at 226–27; *see also Sefzik*, 355 S.W.3d at 623 (noting that when upholding plea to jurisdiction on sovereign immunity grounds, court must allow plaintiff opportunity to replead if the defect can be cured); *Koseoglu*, 233 S.W.3d at 840 (same).

Second, we observe that Bacon purports to have asserted claims solely against THC. Sovereign immunity would categorically bar those claims unless and only to the extent that the Legislature has waived THC's sovereign immunity against them. *See Sefzik*, 355 S.W.3d at 620–21. Likewise, so long as Bacon sues only THC, he has not and cannot invoke the district court's jurisdiction through the ultra-vires exception to sovereign immunity, which requires that he instead name an agency officer, in his or her official capacity, as the defendant. *See id.* at 621–22; *Heinrich*, 284 S.W.3d at 372–73. This is true not only of Bacon's current or potential claims predicated on THC actions that allegedly exceed its statutory authority, but also Bacon's constitutional claims, which are merely a species of ultra-vires claims. *See Heinrich*, 284 S.W.3d at 371–72; *Creedmoor-Maha*, 307 S.W.3d at 514–15. However, to the extent that any such jurisdictional defect in an ultra-vires claim is considered to be curable by repleading, *see Sefzik*, 355 S.W.3d at 623, we will proceed

23

to address whether Bacon has otherwise invoked (or could invoke) the district court's jurisdiction over these claims.

Our third and final threshold observation is that Bacon cannot claim any legally protected interest in the content of the Mount Bonnell historical marker, per se, that would be considered distinct from that of the general public. THC approves Official Texas Historical Markers on behalf of all the people of Texas, who share a common stake in the accuracy and professionalism with which the agency (or any agency) performs its delegated duties on their behalf, and even a complaint that THC was somehow acting illegally or abusing its discretion in regard to the Mount Bonnell marker would not, in itself, confer standing upon Bacon to challenge the agency's actions in court. *See Venable*, 372 S.W.3d at 136–37. Nor can Bacon make any claim of a property right in the marker itself. Likewise, the content of the marker does not refer to Bacon, but to third parties and events occurring almost two centuries ago. And while Bacon, like other Society members, emphasizes a deep commitment and sense of duty to defend what he views as the recognition and honor properly owed to a fellow soldier, West Point graduate, and military hero, such subjective interests or concerns, however admirable, are not in themselves considered to rise to the level of a justiciable interest that can support standing in court. *See Save Our Springs*, 304 S.W.3d at 894 (holding that members of advocacy group who claimed "environmental," "scientific," and "recreational" interests in preventing alleged pollution of a public spring-feed pool, without more, had not established interest distinct from that of general public); *see also Lujan*, 504 U.S. at 575–77. To the contrary, they merely signal an impetus for the democratic political participation in which Society members, like other members of the public, are free to engage through the Legislative and Executive branches. *See Lujan*, 504 U.S. at 576 ("Vindicating the *public* interest (including the

24

public interest in Government observance of the Constitution and laws) is the function of Congress and the Chief Executive.").

Within his four issues, however, Bacon insists that he has asserted (or could assert) four sets of claims that are not barred by sovereign immunity and in which he has an interest going beyond his subjective concerns with the content of the Mount Bonnell historical marker.

### *Section 442.012(a)*

In his first issue, Bacon argues that he asserted (or could assert) a claim under Government Code section 442.012(a), a "private attorney general" provision of THC's enabling statute that permits "any resident of this state [to] file suit in district court to restrain and enjoin a violation or threatened violation of this chapter . . . , to recover on behalf of the state a civil penalty provided by this chapter, . . . or for both injunctive relief and a civil penalty." *See* Tex. Gov't Code § 442.012(a).[26] Bacon reasons that section 442.012(a) confers standing on him to sue as a "resident of this state" to "restrain and enjoin" violations of chapter 442, and that he has alleged conduct by THC that would constitute violations. However, even if section 442.012(a) otherwise authorized Bacon to bring his suit, it would not, as THC emphasizes, waive the sovereign immunity that shields the agency against this or any other claim Bacon brings against it.

In order for a statute to be construed by the courts as allowing a claim against the government, it must clearly and unambiguously waive sovereign immunity. *See id.* § 311.034 (Code Construction Act provision regarding waiver of sovereign immunity); *IT-Davy*, 74 S.W.3d at 854 (quoting Tex. Gov't Code § 311.034, citing *York*, 871 S.W.2d at 177). It is established that

---

[26] Venue of such a suit is in Travis County or "the county in which the activity sought to be restrained or penalized is alleged to have occurred, be occurring, or be about to occur." Tex. Gov't Code § 442.012(b). As indicated above, Bacon filed his suit in Travis County district court.

a statute that merely permits the state to "sue or be sued" or to "plead or [be] impleaded" is not sufficient to waive sovereign or governmental immunity. *See Tooke*, 197 S.W.3d at 342 (concluding that phrase "sue and be sued," standing alone, is ambiguous as to waiver of immunity and, therefore, did not suffice to waive it). The cause of action authorized by section 442.012 is of the same nature: it allows a resident to file suit to restrain or enjoin a violation of chapter 442, but mentions nothing about immunity or governmental defendants. *See* Tex. Gov't Code § 442.012(a). As such, it is not a clear and unambiguous waiver of sovereign immunity. *See Tooke*, 197 S.W.3d at 342. Accordingly, we overrule Bacon's first issue on appeal.

### *Applicant status*

Bacon's second and third issues are premised on an assertion that he acquired standing to assert several of his claims (or potential claims) by virtue of his status as an applicant for THC approval of a new Mount Bonnell historical marker.[27] In his second issue, Bacon urges that his rights or interests as an applicant were violated by THC's rejection of his application and by its reliance on substantive disagreements with Bacon's historical views in doing so. These actions exceeded THC's statutory authority regarding Official Texas Historical Markers, Bacon insists, because the Legislature confined the agency's authority chiefly to non-substantive editorial control over the final wording and shape of markers that have been substantively approved by local county historical commissions (which he insists occurred here, at least initially), and that it had no power

---

[27] Because the distinction is ultimately immaterial to our analysis, we will assume without deciding that, as the parties seem to presume, Bacon would be considered an applicant not only with respect to the 2011 filing he submitted under his name, but also to the 2004 application that was submitted on the Society's behalf. We will similarly assume that, as Bacon insists, his 2011 filing was in the nature of a motion for rehearing of THC's actions in 2005 rather than a separate application. Consequently, we need not reach several procedural and waiver arguments that THC advances in reliance on a contrary view. *See* Tex. R. App. P. 47.1.

to reject such an application outright. Based on this premise, Bacon further argues that his claims (or potential claims) invoke the district court's subject-matter jurisdiction via the ultra-vires exception to sovereign immunity.

Relatedly, Bacon urges that THC exceeded its authority by requiring him to present "conclusive evidence" that Mount Bonnell was named for Joseph Bonnell in order to obtain THC approval of a replacement marker. This assertion is based on his interpretation of the October 2005 letter from THC's executive director advising that the agency staff had declined to approve a replacement marker and that "should we uncover any conclusive evidence in the future that the Austin landmark was named for him, we will certainly let you know." Further, in his third issue, Bacon argues that this purported "conclusive evidence" standard amounted to a "rule" under the APA. He emphasizes that the Legislature explicitly made THC "subject to . . . the administrative procedures act," *see* Tex. Gov't Code § 442.002(j), which would include compliance with the APA's notice-and-comment rulemaking requirements, *see* Tex. Gov't Code §§ 2001.021–.041 (APA rulemaking provisions). Because THC undisputedly did not comply with the APA's rulemaking procedures when creating this "rule," Bacon adds, he can challenge it through section 2001.038 of the APA, which authorizes suits for declaratory judgment against an agency to determine the "validity or applicability of a rule." *See id.* § 2001.038; *Sefzik*, 355 S.W.3d at 622 (noting that section 2001.038 allows a plaintiff to challenge the validity or applicability of a rule); *Texas Boll Weevil Eradication Found., Inc. v. Lewellen*, 952 S.W.2d 454, 499 (Tex. 1997) (same).

Also within his third issue, Bacon advances what amounts to a more nuanced version of his trial-level argument that THC's proceedings had constituted a "contested case," such

27

that he could seek judicial review from the agency's "final decision" under APA 2001.171.[28] Again emphasizing THC's reference to "conclusive evidence" in its 2005 letter, Bacon insists that the agency required him to prove conclusively that Mount Bonnell was named for Joseph Bonnell, and that this imposition of a standard contemplating proof and evidence entitled him to a contested-case hearing (and, in turn, to seek judicial review via APA section 2001.171).

None of these claims (or potential claims) invoke the district court's subject-matter jurisdiction. The reasons why begin with the fundamental distinction between "standing" before an administrative agency (i.e., the right to participate in some fashion, formally or informally, in an administrative proceeding) and the constitutional standing required to invoke a court's subject-matter jurisdiction. "Standing" to participate in an agency proceeding does not in itself confer, and is not the same as, the constitutional standing required to litigate in court. *See Stone v. Texas Liquor Control Bd.*, 417 S.W.2d 385, 386 (Tex. 1967) (citing *Brazosport*, 342 S.W.2d at 747); *see also Fort Bend Cnty. v. Texas Parks & Wildlife Comm'n*, 818 S.W.2d 898, 899–900 (Tex. App.—Austin 1991, no writ) (discussing prior version of APA and noting that standing to participate in an agency proceeding does not necessarily confer standing to appeal agency's decision); *City of Houston v. Public Util. Comm'n*, 599 S.W.2d 687, 690 (Tex. Civ. App.—Austin 1980, no writ) (noting that fact that party is allowed to participate in administrative hearing is not conclusive of the issue of a "justiciable interest" for purposes of judicial review of agency action). Rather, Bacon must meet the constitutional standing requirements to seek judicial relief regarding the THC proceedings—and

---

[28] Based on the filings in the appellate record, it seems that Bacon's theory before the district court was that the proceedings before THC had constituted a "contested case" because the agency had "contested" (i.e., disagreed with) his application seeking to change the Mount Bonnell marker. *Cf.* Tex. Gov't Code § 2001.003(1) (defining "contested case" as "a proceeding, including a ratemaking or licensing proceeding, in which the legal rights, duties, or privileges of a party are to be determined by a state agency after an opportunity for adjudicative hearing").

the bare fact that he could be said to have "standing" before the agency is not enough. *See, e.g.*, *Texas Rivers Prot. Ass'n v. Texas Natural Res. Conservation Comm'n*, 910 S.W.2d 147, 151 (Tex. App.—Austin 1995, writ denied); *Fort Bend Cnty.*, 818 S.W.2d at 899. In short, Bacon's status as an applicant for a new Mount Bonnell historical marker does not in itself resolve his standing problems that we noted at the beginning of this section.

In any event, even if Bacon could be said to possess some sort of legally protected interest by virtue of his applicant status, analysis of the statutory scheme defining THC authority over Official Texas Historical Markers demonstrates that sovereign immunity would bar the claims addressed in his second and third issues. Contrary to Bacon's view, the Legislature has delegated THC broad authority to control the context of historical markers. *See* Tex. Gov't Code § 442.006(b)–(c) (directing THC "to install markers" and in so doing "assure a degree of uniformity and quality of historical markers" by "review[ing] and approv[ing] or reject[ing] the . . . text . . . on any marker"), (h) (directing THC to establish rules for application and review of applications for historical markers). In fact, the Legislature has delegated expansive powers to THC over everything from "themes" for the markers, to the number of markers to "award," to the final approval of the text and form of the monuments. *See id.* § 442.006. Furthermore, THC's delegated authority to "award" markers and "approve" or "reject" text is not qualified or limited so as to exclude control over substantive or historical content in particular, as Bacon suggests. *See id*. To the contrary, consideration of historical content would be inherent in THC's performance of its delegated powers to approve or reject the text of what is, after all, an Official Texas *Historical* Marker. *See* *Texas Mun. Power Agency v. Public Util. Comm'n*, 253 S.W.3d 184, 192–93 (Tex. 2008) (recognizing that agency has "implied powers that are reasonably necessary to carry out the express responsibilities given to it by the Legislature").

Likewise, while delegating this broad authority to THC to control historical content and other features of Official Texas Historical Markers, the Legislature did not prescribe or require any particular fact-finding procedure that the agency must follow in regard to historical content. The Legislature required only that THC establish *guidelines* for marker applications and THC's review of such applications, but left the material features of these processes to the agency's discretion. *See* Tex. Gov't Code § 442.006. Similarly, the rules that THC has adopted regarding marker applications, while permitting applications to be made and setting forth a process by which the agency may evaluate them, do not explicitly address or contemplate participation by the applicant beyond submitting the application itself, nor do they address any determination of historical merits by the agency or prescribe any process for doing so. *See* 13 Tex. Admin. Code §§ 21.07, .09 (2012) (THC, Application Evaluation Procedures). In short, the Legislature and THC's rules have left the agency broad discretion regarding the manner in which it determines to approve or reject the text of an Official Texas Historical Marker, and neither require or prohibit any particular process for addressing historical content—let alone mandate the trial-type hearings that Bacon advocates. And as for Bacon's view that THC has somehow invoked a right to a contested-case hearing that arises independently from the APA, the Texas Supreme Court has squarely rejected that notion in its recent *City of Waco* decision. *See Texas Comm'n on Envtl. Quality v. City of Waco*, No. 11-0729, slip op. at 24 (Tex. Aug. 23, 2013), available at http://www.supreme.courts.state.tx.us/historical/082313.asp (holding that the APA "does not independently provide a right to a contested case hearing").

Finally, the Legislature did not authorize any form of judicial review of a THC decision to "award" or not "award" a marker, approve or reject text or historical content, or any of the incidental decisions the agency makes during that process. It did not create any such right in THC's enabling statute. *See* Tex. Gov't Code § 442.006. Nor did it do so indirectly through the

30

APA because the right of judicial review provided therein applies only to final decisions in contested cases, *see* Tex. Gov't Code § 2001.171, and the THC proceedings here were not a contested case,[29] nor were they required to be per *City of Waco*.

The absence of judicial review, together with the other features of the statutory scheme governing THC approval of Official Texas Historical Markers, confirms the Legislature's intent to delegate broad discretion to THC to decide the content of such markers and how it decides it. *See Creedmoor-Maha*, 307 S.W.3d at 514–15; *Merritt v. Cannon*, No. 03-10-00125-CV, 2010 WL 3377778, at *2 (Tex. App.—Austin Aug. 27, 2010, pet. denied) (mem. op.) (citing *id.*). These statutory features also demonstrate that Bacon can avail himself of neither the waiver of sovereign immunity in APA section 2001.171 (again, no contested case), nor the ultra-vires exception—he has not complained of any THC conduct that would exceed its statutory authority, *see Heinrich*, 284 S.W.3d at 372 (to come within ultra-vires exception, plaintiff "must allege, and ultimately prove, that the officer acted without legal authority or failed to perform a purely ministerial act"). They likewise demonstrate that the "right" or "interest" that a marker applicant possesses is ultimately little more than the opportunity to petition THC to exercise its broad discretion so as to agree with the applicant. And while an applicant might reasonably expect that THC will take certain historical information into account when deciding whether to grant the application, a "mere expectation" does not rise to a level sufficient to confer standing to contest

---

[29] Bacon seems to concede this point on appeal, and wisely so. *See* Tex. Gov't Code § 2001.003(1) (defining "contested case"); *Ramirez v. State Bd. of Med. Exam'rs*, 927 S.W.2d 770, 772 (Tex. App.—Austin 1996, writ denied) (holding that "adjudicative hearing" in APA definition of "contested case" means "a hearing at which the decision-making agency hears evidence and, based on that evidence and acting in a judicial or quasi-judicial capacity, determines the rights, duties, or privileges of parties before it") (citing *Best & Co. v. Texas State Bd. of Plumbing Exam'rs*, 927 S.W.2d 306, 309 n.1 (Tex. App.—Austin 1996, writ denied)).

THC's decision in the absence of a legislatively conferred right of judicial review. *See National Carloading Corp. v. Phoenix-El Paso Express*, 176 S.W.2d 564, 570 (Tex. 1944) (vested right is something more than "a mere expectation"); *see also Hancock*, 239 S.W.2d at 790 (discussing "inherent right of judicial review" that can arise from adverse effect on vested property right). Further, absent a right of judicial review from the THC proceedings or other claim to challenge them that is within the district court's jurisdiction, Bacon's section 2001.038 claim for declaratory relief is moot. *See Texas Logos, L.P. v. Texas Dep't of Transp.*, 241 S.W.3d 105, 114 (Tex. App.—Austin 2007, no pet.) (noting that declaratory action under section 2001.038 requires existence of underlying justiciable controversy) (citing *Brooks v. Northglen Ass'n*, 141 S.W.3d 158, 163–64 (Tex. 2004)). Accordingly, we overrule Bacon's second and third issues.

### *Property interest*

Bacon's remaining jurisdictional theories, asserted in his fourth and final issue, relate to his constitutional claims. In an attempt to bring this case under the "inherent right of judicial review" rubric, Bacon insists that he has complained of conduct by THC that deprived him of "vested rights," i.e., property, in a manner violating the due-process guarantees of the Texas and U.S. constitutions. *See Chemical Bank*, 369 S.W.2d at 433 ("When a vested property right . . . has been affected by the action of an administrative agency, thereby invoking the protection of due process of law, there is an inherent right of appeal.") (citing *Brazosport*, 342 S.W.2d at 750; *Hancock*, 239 S.W.2d at 790). As the source of the property right on which such a claim must be based, *see id.*, Bacon points to "valuable copyrighted intellectual property"—the paper that he filed with THC in 2011, *Reconsidering the Historical Marker on Mount Bonnell*. As an initial observation, this paper was not authored by Bacon, but by another Society member, Bothwell, and

it is Bacon, not the Society or its other members, who is the plaintiff here and must possess the property right and, in turn, standing. But more fundamentally, even if Bacon could claim some sort of ownership interest in Bothwell's paper, he has not alleged or presented evidence of facts that would constitute a deprivation of such rights in a manner violating due-process protections.

In contending otherwise on appeal, Bacon seems to presume that it is enough for him to plead legal conclusions to the effect that THC "violated due process" by "depriving" him of property rights in the paper. To the contrary, Bacon's burden is to present *facts* that would constitute due-process violations. *See Creedmoor-Maha*, 307 S.W.3d at 517. The only due-process "deprivations" of which Bacon seems to complain, even implicitly, is that THC disagreed with or simply ignored the historical content of the paper without holding a trial-like hearing to determine its historical merits. We have already rejected the notion that the Legislature required THC to conduct any such procedure before rejecting Bacon's request, and Bacon refers us to no authority suggesting that the state or federal constitutions do. Nor does Bacon explain why or how his asserted "property right" in the paper was somehow infringed by THC's exercise of its discretion not to change the Mount Bonnell marker to conform to those views. Bacon's due-process theory, in short, is without merit.

### *Speech guarantees*

Bacon's remaining constitutional claims purport to be rooted in the free-speech guarantees contained in the First Amendment to the U.S. Constitution[30] and article I, section 8 of the

---

[30] "Congress shall make no law . . . abridging the freedom of speech . . . ." U.S. Const. amend. I.

Texas Constitution. He places particular emphasis on the portion of the Texas protection that is emphasized below:

> Every person shall be at liberty to speak, write or publish his opinions on any subject, being responsible for the abuse of that privilege; and no law shall ever be passed curtailing the liberty of speech or of the press. In prosecutions for the publication of papers, investigating the conduct of officers, or men in public capacity, or **when the matter published is proper for public information, the truth thereof may be given in evidence.** And in all indictments for libels, the jury shall have the right to determine the law and the facts, under the direction of the court, as in other cases.

Tex. Const. art. I, § 8 (emphasis added). Bacon construes the emphasized language to be a constitutional entitlement to present the "truth" about the origins of the Mount Bonnell name, a "matter . . . proper for public information," "in evidence" before THC. Based on this premise, he insists that THC deprived him of that right by rejecting or ignoring the "truth." Bacon fundamentally misconstrues the nature, purpose, and effect of this language. Considered in its proper textual and historical context, this "truth . . . in evidence" language refers instead to a right to present truth as a defense to certain libel claims. *See Ex parte Tucci*, 859 S.W.2d 1, 23–24 (Tex. 1993) (Phillips, C.J., concurring) (exhaustively analyzing the nature and history of article I, section 8). This language simply has no application here. Nor has Bacon otherwise presented any facts that would constitute violations of the Texas or federal free-speech protections.

We overrule Bacon's fourth issue.

**"Fact issues" and right to replead**

In addition to advocating the foregoing jurisdictional theories, Bacon complains that the district court committed two types of procedural errors in rendering its judgment of dismissal. First, Bacon insists that the district court pretermitted numerous "fact issues," citing *Miranda*. The

principle that Bacon attempts to invoke, as previously explained, holds that where a plea to the jurisdiction challenging the existence of a jurisdictional fact *that overlaps the merits* of a claim, the plea cannot be sustained unless the challenger overcomes a summary-judgment-like burden of conclusively negating the fact's existence as a matter of law; otherwise, the fact's existence must be determined at trial. *See Miranda*, 133 S.W.3d at 228. In contrast, to the extent Bacon complains of "fact issues" regarding jurisdictional facts that do *not* overlap the merits of his claims—e.g., facts that went solely to his standing[31]—we would presume that the district court implicitly found (or failed to find) them in a manner that supported its judgment. *See University of Tex. v. Poindexter*, 306 S.W.3d 798, 806–07 (Tex. App.—Austin 2009, no pet.); *Combs*, 292 S.W.3d at 719. But even leaving this distinction aside, the district court would not have erred in proceeding to grant THC's plea.

Bacon's asserted "fact issues" chiefly concern the copies of meeting agendas and minutes that THC attempts to present for the first time on appeal. As previously explained, these documents would have no impact on our analysis even if we were to consider them. The other "fact issues" Bacon identifies concern the import or effect of the THC letters that are in the record, including whether the 2005 events should be considered to represent an administrative proceeding separate from Bacon's request in 2011 and whether THC's 2005 letter referencing "conclusive evidence" signaled the imposition of an evidentiary burden. Even assuming these issues should properly be considered questions of "fact" as opposed to legal effect, our analysis has assumed Bacon's position, and any dispute regarding these questions proved to be immaterial in any event.

---

[31] *See, e.g.*, *Bland Indep. Sch. Dist. v. Blue*, 34 S.W.3d 547, 555 (Tex. 2000).

35

*See Gattis v. Duty*, 349 S.W.3d 193, 207–08 (Tex. App.—Austin 2011, no pet.); *Creedmoor-Maha*, 307 S.W.3d at 526. In short, no "fact issues" precluded the district court from granting THC's plea.

Bacon's second asserted procedural error is that the district court did not afford him an opportunity to replead before dismissing his suit. As previously noted, a claimant is entitled to an opportunity to replead if the jurisdictional defects in his pleadings are not considered to be incurable. *See Sefzik*, 355 S.W.3d at 623; *Koseoglu*, 233 S.W.3d at 840; *Miranda*, 133 S.W.3d at 226–27. Because Bacon has relied on numerous jurisdictional theories that he raises for the first time on appeal, our analysis rejecting those theories has, in essence, also confirmed that those jurisdictional defects are incapable of being cured. Accordingly, the district court was not required to afford him an additional opportunity to invoke its subject-matter jurisdiction.

**CONCLUSION**

Were we called upon to decide, at least on this record, whether the current Official Texas Historical Marker at Mount Bonnell is entirely accurate, or if the factual assertions within it are supported by legally or factually sufficient evidence of the sort that a fact-finder could properly rely upon in court, we might well conclude that these are close and difficult questions. For that matter, we might well conclude the same thing about Bacon's competing version of history, which rests upon a succession of inferences derived from circumstantial evidence that is now almost two centuries old. But this is not a dispute into which the Texas Judiciary has the subject-matter jurisdiction to intervene, and that is what controls our disposition of this appeal.

In this respect, at least, the outcome of this appeal would be the same even if the Mount Bonnell historical marker had stated that Bigfoot Wallace had encountered not only the "Indian" he killed nearby, but also Christopher Columbus and dinosaurs. The prospect that THC

36

would actually approve such text in an Official Texas Historical Marker is presumably unlikely (one hopes), but if the agency were ever so inclined, the checks and balances found elsewhere in the Executive Branch and in the Legislature might well give it some pause. Likewise, it would remain the Legislature's prerogative, within constitutional constraints, to alter these checks and balances, including and not limited to providing the additional check of a judicial remedy. It is in such mechanisms of the Legislative and Executive Branches, not in the Judicial Branch, where Bacon's remedy, if any, would currently lie.

Accordingly, we affirm the district court's judgment of dismissal.

_____
Bob Pemberton, Justice

Before Justices Puryear, Pemberton, and Rose

Affirmed

Filed:   September 12, 2013