

COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS

| | | |
|---|---|---|
| MAX GROSSMAN, | § | No. 08-19-00272-CV |
| Appellant, | § | Appeal from the |
| v. | § | 384th District Court |
| CITY OF EL PASO, | § | of El Paso County, Texas |
| Appellee. | § | (TC# 2017DCV2528) |

## DISSENT

Appellant Max Grossman had three significant hurdles to clear to obtain relief from our Court. He had to show: (1) that the legislature waived governmental immunity for the causes of action he asserts; (2) his claims were not foreclosed by issue or claim preclusion; and (3) that the trial judge abused his discretion in finding against Grossman on what was a conflicting factual record. Because I disagree with the majority's analysis on two of these issues, I respectfully dissent.

Section I of this dissent provides a history of the progression of the litigation in this matter. Section II addresses sovereign immunity. The rationale and result expressed in that section is what the Court, in my opinion, should have issued immediately following oral argument in this case, but which obviously could not garner a second vote. Section III addresses the merits arguments, which I address only because the majority has.

# I. BACKGROUND

The genesis of this dispute is a 2012 bond referendum whereby El Paso voters approved several "quality of life" projects. One of those projects was a "multipurpose performing arts and entertainment facility" which I shorthand as the "Arena." But where to build the Arena? That question was not specified in the ordinance authorizing the referendum other than it was to be "downtown." After some study, the City of El Paso (the City) settled on a four-city-block area in downtown El Paso. The area was once popularly known as the El Paso First Ward, but now is referred to as the Duranguito neighborhood. It is dotted by an assortment of residential and commercial structures, as well as surface parking lots.

Opposition to the site soon followed, leading to three lawsuits that set the table for this appeal. The progression of these suits intertwine and overlap, so I describe each in chronological relation to each other.

## A. The City Files First--the Austin Litigation

To validate the project before issuing 180 million dollars in bonds, the City filed a declaratory judgment action under Chapter 1205 of the Texas Government Code in the 250th District Court of Travis County ("the Austin suit"). Under Chapter 1205, a bond issuer may bring a declaratory judgment action asking a court to validate "the authority of the issuer to issue the public securities" and the "legality and validity of each public security authorization relating to the public securities[.]" TEX.GOV'T CODE ANN. § 1205.021; *see also, Buckholts Indep. Sch. Dist. v. Glaser*, 632 S.W.2d 146, 149 (Tex. 1982) (Chapter 1205's predecessor statute was enacted to stop "the age-old practice of allowing one disgruntled taxpayer to stop the entire bond issue simply by filing suit."). Relying on that provision, the City sought a judicial declaration that the ordinance initiating the election, and its approval by voters, was legal and valid.

Grossman appeared as an interested party in the Austin suit and in part contended that the ordinance which authorized the bond election called for a "performing arts" facility. The City, however, contemplated a structure that could host sporting events. According to Grossman, to be consistent with the ordinance, the Arena could not include a design for sporting events. Following a hearing, the Austin trial court ruled from the bench that it agreed with that part of Grossman's claim, but the court rejected other challenges. The trial court was prepared to enter a judgment finding that the electorate's approval of the bond project, at least for a non-sports facility, was legal and valid. Before the trial court signed a final judgment to that effect, however, Grossman filed the second piece of litigation, and the one before us today.

### B. Grossman Files the Next Suit--the El Paso Litigation

In July 2017, Grossman filed a lawsuit in the 384th District Court for El Paso County (the El Paso suit) objecting to the City's plan on a different basis. In the El Paso suit, Grossman sought to enjoin demolition of buildings in the Arena's footprint under the Texas Antiquities Code. *See* TEX.NAT.RES.CODE ANN. § 191.001-191.094. One provision of that Code requires the person primarily responsible for a project on state or local public lands to first notify the Texas Historical Commission (THC), which in turn must determine if the site requires protection, or whether an archeological survey is necessary. *Id*. § 191.0525(a), (b). Grossman alleged that several structures in the four-city-block footprint are historically or architecturally significant. His pleading also referenced a prior survey that suggested the "potential for historic archaeological sites" in the area. Because the City had allegedly failed to notify or obtain a permit from the THC, Grossman sought to enjoin the City from entering into further contracts related to the project until it fully complied with the Antiquities Code.

Before the hearing on a temporary injunction, the City filed a plea to the jurisdiction, contending that Grossman failed to plead any facts that establish a waiver of the City's governmental immunity. It also claimed the Antiquities Code does not contain a clear and unambiguous waiver of the City's immunity. Just prior to the hearing on the temporary injunction, the trial court denied the City's plea to the jurisdiction. The City then immediately pursued an interlocutory appeal of that ruling with this Court (which effectively stayed the injunction hearing). Grossman immediately filed with this Court a petition for writ of injunction to halt demolition of buildings in the footprint of the Arena. We notified the Texas Supreme Court of our recusal of the entire panel, and both appeals were transferred to the Second Court of Appeals. That court granted the writ of injunction pending its hearing of the companion appeal.

### C. The City Links the Austin Suit to the El Paso Suit

Meanwhile, back in Austin, the City asked the trial court to enjoin further prosecution of the El Paso suit. One provision of the Government Code under which the City brought suit authorized the Austin court to enjoin any litigation that might undermine the court's validation of the bonds. TEX. GOV'T CODE ANN. § 1205.061. Based on that provision, the City asked the Austin court to enjoin further prosecution of the El Paso suit. The Austin trial court denied that request. As part of its final judgment, the Austin court took judicial notice of the El Paso suit, but also expressly declined to exercise jurisdiction over the Antiquities Code cause of action.

The City appealed that judgment to the Third Court of Appeals.

### D. The City Obtains a Permit from THC

The El Paso suit was based in part on the claimed failure of the City to notify the THC of the impending project. The City resolved any notice issue, however, when its agent, Moore

4

Archeological Consulting, Inc. (Moore), sent a notice letter to the THC in May of 2018.[1]  In June 2018, the THC responded by outlining its requirements for issuing a permit.  In August of 2018, Moore submitted a permit application, scope of work, and research design.  Those documents included a description of the area at issue, historical photographs and drawings depicting its evolution over time, and a description of some prior excavations in the vicinity.  The research design noted that no buildings within the footprint are presently listed in the National Register of Historic Places or are defined as contributing elements to such districts.  Thus, Moore's proposed plan was limited to the potential for subsurface archaeological deposits.  And the research design itself notes the potential of "prehistoric or early historic Native American activity" in the area, and the possibility of finding among other things, pottery, lithic tools, cooking pits, pueblo-style building remnants, and while less likely, human remains.[2]

The proposed plan contemplated surveying the open areas (streets, parking lots, and walkways) with ground penetrating radar (GPR) to identify possible archeological features.  As existing building are demolished down to ground level, the footprint of those structures would also

---

[1] And based on having notified the THC of its plans, the City moved to dismiss its interlocutory appeal of the El Paso case that was then pending before the Second Court of Appeals.  The City reasoned that the merits of the dispute were moot because the City had notified the THC of its plans for the Arena.  The City also withdrew its plea to the jurisdiction by recasting its jurisdictional argument.  It claimed that its original plea to the jurisdiction was predicated on the fact it did not own all the properties at issue, but during the course of the appeal, it in fact obtained title to those properties.  The Fort Worth court dismissed the interlocutory appeal.  *City of El Paso v. Grossman*, 02-17-00384-CV, 2018 WL 4140461, at *3 (Tex.App.--Fort Worth Aug. 30, 2018, no pet.) (mem. op.).

[2] The research design notes that the project area was part of the "first homestead and farmlands of Juan Maria Ponce de Leon, the earliest European settler on the north side of this segment of the Rio Grande."  Ponce de Leon built his first home in or immediately adjacent to the project area around 1827.  After Ponce de Leon's death, a syndicate--the El Paso Company--acquired the land and hired Anson Mills to plat the area as a town in 1859.  The Arena project encompasses an area that once contained the original City Hall and Fire Station, "Toenigges' Beer Garden," "Myar's Opera House," a short-lived skating rink, and several brothels.  By 1908 roughly 70% of the project area was made up of small single-family dwellings, boarding houses, tenements, apartments, or vacant lots.  Grossman testified that a prior City survey identified fourteen structures that were eligible to be added to the National Register of Historic Places, or eligible to be contributing buildings within a national registered district.  One remaining structure of note from that period includes a building circa 1902, that housed a "Chinese Laundry" which has been converted into a residence.  But much of Grossman's complaint about the research design was that it was Euro-centric in that it failed to include sufficient detail for the time-period before Ponce de Leon's ranch.

be surveyed by GPR. "Results of the GPR survey will be evaluated and used to help propose a focused strategy for conducting a mechanical survey of the project area." The mechanical survey contemplated digging trenches to expose, but not remove archeological features or intact deposits. Afterwards, the City would share an inventory of the findings with the THC.

A THC project reviewer raised initial questions about the depth of construction disturbances, the qualifications of the GPR operator, and the rationale for GPR before and after demolition. After resolution of those questions, THC issued a permit to the City on October 15, 2018. The archeological survey design approved by the THC included three phases: (1) the demolition of the buildings in the footprint of the Arena, (2) an underground survey of the site using GPR, and (3) a subsurface investigation.

### E. Grossman Files Suit Against THC's Director, Mark Wolfe

Grossman then filed the third lawsuit relevant to our appeal. In Travis County, Grossman filed suit against Mark Wolfe, the Director of THS (the Wolfe suit). The pleadings in that suit are not in our record, but the background is evident from the subsequently published appellate decision of the Third Court of Appeals. *Grossman v. Wolfe*, 578 S.W.3d 250 (Tex.App.--Austin 2019, pet. denied). The suit sought declaratory and injunctive relief contending that the permit for the Arena was unlawfully issued. Grossman alleged, (1) that Wolfe acted *ultra vires* by issuing the permit himself without the Commission's approval, and (2) the permit allowed the City to "commence" the Arena project--to include demolishing the existing buildings--before completion of the archeological survey. As to this later claim, the Antiquities Code provides that if an archeological survey is necessary, "the project may not commence until the archeological survey is completed." TEX.NAT.RES.CODE ANN. § 191.0525(c). Grossman asked the district court to declare the permit

6

void and to enjoin the City from conducting the archeological survey authorized by the permit. *Wolfe*, 578 S.W.3d at 254.

The City intervened in the suit, and in part asserted that sovereign immunity barred Grossman's claims against Wolfe. The City argued that neither the Government Code nor the Antiquities Code contain an express waiver of immunity. The district court sustained a plea to the jurisdiction and dismissed Grossman's case.

## F. The Third Court of Appeals Rules Against Grossman

The City filed an appeal from the Austin lawsuit and Grossman filed an appeal from the Wolfe lawsuit. Both appeals were decided by the Third Court of Appeals; those decisions are relevant here, so I outline the key holdings.

### 1. The Austin suit

In November 2018, the Third Court of Appeals affirmed in part and reversed in part the Austin trial court's judgment. *Ex parte City of El Paso*, 563 S.W.3d 517 (Tex.App.--Austin 2018, pet. denied). Relevant here, the Third Court of Appeals first held that the trial court erred in ruling that the arena must exclude sporting events. According to the court, a grammatically correct construction of the ordinance that authorized the bond election would permit construction of an Arena that could also host sporting events. *Id.* at 525. Second, the court of appeals concluded that the trial court erred in failing to issue an injunction against Grossman for pursuing the El Paso litigation. At least that is what its opinion stated: "Because Grossman's El Paso suit is a proceeding that 'contests the validity of . . . an action or expenditure of money relating to the public securities, a proposed action or expenditure, or both,' the district court was authorized to enjoin the prosecution or maintenance of the suit." *Id.* at 527, *quoting* TEX.GOV'T CODE ANN. § 1205.061(a)(4). "The district court's failure to do so was an abuse of discretion because

7

Grossman's El Paso suit prevents final resolution of all matters subject to the City's [declaratory judgment] lawsuit." *Ex parte City of El Paso*, 563 S.W.3d at 527. The court of appeals judgment, however, only enjoined Grossman from filing a lawsuit (as distinct from pursuing an already filed action).[3] *Id*. at 528. Grossman unsuccessfully petitioned the Texas Supreme Court for review of this decision.

### 2. *The Wolfe suit*

In the *Wolfe* case, our sister court concluded that while Grossman had standing to raise his challenges, Wolfe was protected by sovereign immunity. Grossman could not sue a state actor without legislative permission, but under Texas law he could sue an individual state employee who acted "*ultra vires*" (that is, where the officer acted without legal authority or failed to perform a purely ministerial act). *Wolfe*, 578 S.W.3d at 258, *citing City of El Paso v. Heinrich*, 284 S.W.3d 366, 372 (Tex. 2009). Relevant here, Grossman contended that Wolfe acted illegally or without authority because the permit allowed the City to "commence" the Arena project by demolishing buildings *before* the archeological survey was completed. And section 191.0525(c) of the Antiquities Code states "the project may not commence until the archeological survey is completed." TEX.NAT.RES.CODE ANN. § 191.0525(c).

---

[3] The Third Court's judgment reads:

> IT IS FURTHER ORDERED that, as specified by Texas Government Code section 1205.151, this Final Judgment is a permanent injunction against the filing by any person or entity of any proceeding contesting the validity of the bonds, the authorization of the bonds, the expenditure of money relating to the bonds in conformity with this judgment, the provisions made for payment of the bonds or of interest thereon, any matter adjudicated by this Final Judgment, and any matter that could have been raised in these proceedings.

https://search.txcourts.gov/SearchMedia.aspx?MediaVersionID=31c848f1-e5e4-4c23-80ac-796205176d09&coa=coa03&DT=Opinion&MediaID=57a2d895-7392-4834-bd6c-7e359ab85380 (last visited October 22, 2021)

Nonetheless, the court held Grossman had not asserted a viable *ultra vires* claim because the Antiquities Code and the Commission's rules gave it "broad discretion" in how archeological surveys are performed and how permits are issued. *Wolfe*, 578 S.W.3d at 260. The THC understood that the City intended to use GPR to survey 100% of the project footprint. Any items of archeological significance would be found below ground. As the Third Court of Appeals noted, "There is no indication that the buildings have historical or archeological value." *Id.* at 261. "And the record before us indicates that demolition of existing buildings is required to perform a subsurface survey, and that is what the permit at issue here allows." *Id*. Because the THC acted within its discretion to approve the permit, Grossman failed to assert a true *ultra vires* claim, and his suit did not fall within that exception to sovereign immunity.

But Grossman had also asserted an alternative theory. On appeal he claimed that if his *ultra vires* claim failed, then section 191.173(a) itself waived Wolfe's immunity. *Id*. at 261. That section provides:

> A citizen of the State of Texas may bring an action in any court of competent jurisdiction for restraining orders and injunctive relief to restrain and enjoin violations or threatened violations of this chapter, and for the return of items taken in violation of the provisions of this chapter.

TEX.NAT.RES.CODE ANN. § 191.173. And the legislature can waive its sovereign immunity by legislative consent expressed in "clear and unambiguous language." TEX.GOV'T CODE ANN. § 311.034; *Texas Nat. Resource Conservation Comm'n. v. IT-Davy*, 74 S.W.3d 849, 853-54 (Tex. 2002). Grossman claimed section 191.173 provides that consent. But because Grossman had not plead a section 191.173 theory against the THC at the trial court, the court of appeals treated this claim as a request to remand the case so Grossman could replead. It denied that request, however, because pleading this theory would be futile. *Wolfe*, 578 S.W.3d at 261. The Third Court of Appeals had previously held that a virtually identical statute had not waived the THC's immunity.

9

*Id. citing Bacon v. Texas Historical Comm'n*, 411 S.W.3d 161, 172 (Tex.App.--Austin 2013, no pet.). The court thus concluded that section 191.173 did not waive sovereign immunity. *Wolfe*, 578 S.W.3d at 261.

Grossman pursued a further appeal of this holding with the Texas Supreme Court, which denied his petition for review.

### G. Grossman Rekindles the El Paso Litigation

After the Texas Supreme Court denied the petition for review (and motion for rehearing) in the *Wolfe* lawsuit, Grossman amended his petition in the El Paso litigation to assert a new factual theory against the City.[4] The amended petition alleged that in October 2018, author Mark Santiago published a new book that documented a Mescalero Apache "Peace Camp" on the north bank of the Rio Grande which could have been on the present site of the Duranguito neighborhood. According to Santiago's book, this Peace Camp was used intermittently between 1778 and 1825 and continuously between 1790 and 1794.

Based on this new information, Grossman alleged that the project must be stopped until a plan could be developed "to uncover, study, and retrieve artifacts from the Peace Establishment era and preserve this area for future study."[5] An exchange of letters shows that Grossman's lawyers raised the "Peace Camp" issue with the THC in September 2019, attaching declarations from several experts, including author Mark Santiago. The THC wrote to the City on October 7,

---

[4] The Texas Supreme Court denied the petition for review on August 9, 2019, and the motion for rehearing on October 4, 2019. Grossman filed the amended petition in the El Paso suit on October 17, 2019.

[5] More specifically, the amended petition sought to require Moore to review all the available primary source material for the Peace Camp, including the documentation located in archives in Mexico City and Seville, Spain. It would also require Moore to review archeological reports from the El Paso Convention Center in 1970 and "produce a Scope of Work requiring excavation to the appropriate depth, employing techniques that include federally approved safeguards for its workers, in order to thoroughly investigate the Spanish Colonial period."

2019, recommending that it familiarize itself with "Santiago's work and consider the potential for encountering cultural deposits associated with the peace camp during [its] investigations." But otherwise, the THC did not revoke its permit.

The City promptly filed an amended plea to the jurisdiction incorporating the holding from the Third Court of Appeals decision in the *Wolfe* suit.

The trial court heard both the plea to the jurisdiction and temporary injunction on October 21, 2019. At the injunction hearing, it took testimony from three historians and two archeologists. The City does not contest the evidence submitted by the historians that the Mescalero Apache may have had a Peace Camp in the footprint of the Arena project, nor that studying artifacts from that encampment is a worthy undertaking. Rather, the parties clashed over the strategy to uncover any archeological finds. Advocating for Grossman, Dr. Michael Carmichael questioned the efficacy of using GPR in sandy soils. He criticized Moore's plan because it proposed scrapping the surface, then trenching, when he would start with a grid of trenches. And the material excavated from the trenches should be sieved through 1/8 inch versus 1/4 inch screens to find the smaller items likely found with Native American encampments. He also questioned the depth which the survey should reach. A nearby prior excavation, not mentioned in the Moore report, found native American artifacts at twenty feet. In retort, archeologist Douglas Mangum, the named author of Moore's research design, testified that the survey would search to whatever depth was necessary to uncover archeological finds. His original design contemplated the possibility of Mescalero Apache artifacts, and he would follow the THC's letter guidance to consider the Peace Camp outlined in Santiago's new book.

11

The trial court denied both the plea to the jurisdiction and the temporary injunction. Grossman and the City perfected appeals from the adverse rulings on their respective motions, which we combined for the purposes of this appeal.[6]

## II. GOVERNMENTAL IMMUNITY

### A. Governmental Immunity

When it applies, governmental immunity protects political subdivisions of the State, including cities, from suit. *See Wichita Falls State Hospital v. Taylor*, 106 S.W.3d 692, 694 n.3 (Tex. 2003); *Tabrizi v. City of Austin*, 551 S.W.3d 290, 295-96 (Tex.App.--El Paso 2018, no pet.). Governmental immunity generally applies to municipalities when they are performing governmental as opposed to proprietary functions. *Wasson Interests, Ltd. v. City of Jacksonville*, 489 S.W.3d 427, 439 (Tex. 2016). Planning and development of a coliseum is a governmental function. *See* TEX.CIV.PRAC.& REM.CODE ANN. § 101.0215(16) (so stating under Texas Tort Claims Act); *CHW-Lattas Creek, L.P. by GP Alice Lattas Creek, L.L.C. v. City of Alice*, 565 S.W.3d 779, 782 (Tex.App.--San Antonio 2018, pet. denied) (failure of city to build amphitheater implicated governmental and not propriety function); *City of San Antonio v. Butler*, 131 S.W.3d 170, 178 (Tex.App.--San Antonio 2004, pet. denied) (city's concession contract for vendors in the Alamodome was part of its governmental function of owning, operating, or maintaining a civic center or coliseum).

Several other aspects of governmental immunity are worthy of mention:

---

[6] We granted Grossman's motion for emergency relief and stayed the project pending the resolution of this appeal. The City filed a motion to reconsider which the Court denied shortly after oral argument, over my dissent.

*1. Immunity is a doctrine as old or older than the archeological finds at issue*

Sovereign immunity has its roots in the English common-law dating back more than six hundred years. *Tooke v. City of Mexia*, 197 S.W.3d 325, 331 (Tex. 2006) (governmental immunity is "an established principle of jurisprudence in all civilized nations") *quoting Beers v. State of Arkansas*, 61 U.S. 527 (1857); *see also* 3 WILLIAM BLACKSTONE, COMMENTARIES ON THE LAWS OF ENGLAND 254 (1768). Texas first recognized sovereign immunity as a principle of its law more than 170 years ago. *See Hosner v. DeYoung*, 1 Tex. 764 (1847) ("[N]o state can be sued in her own courts without her consent, and then only in the manner indicated by that consent."). Federal courts acknowledged the doctrine at least twenty years earlier. *See Cohens v. State of Virginia*, 19 U.S. 264 (1821). The doctrine is acknowledged in the Federalist papers written at the founding of our Republic. *See Wichita Falls State Hosp. v. Taylor*, 106 S.W.3d 692, 695 (Tex. 2003) *citing* THE FEDERALIST No. 81, at 487 (Alexander Hamilton) (Clinton Rossiter ed., 1961).

"Although the justifications for its existence have evolved through the years, we have steadfastly retained it in modern times precisely because it shields 'the public from the costs and consequences of improvident actions of their governments[,]' and ensures that the taxes the public pays are used 'for their intended purposes[.]'" *Hillman v. Nueces County*, 579 S.W.3d 354, 361 (Tex. 2019), *quoting Tooke*, 197 S.W.3d at 332, and *Reata Const. Corp. v. City of Dallas*, 197 S.W.3d 371, 375 (Tex. 2006). Without this protection, public funds would be used to defend lawsuits and pay judgments instead of providing public services, leading to "governmental paralysis." *Hughes v. Tom Green County*, 573 S.W.3d 212, 218 (Tex. 2019). Relatedly, immunity "preserves separation-of-powers principles by preventing the judiciary from interfering with the legislature's prerogative to allocate tax dollars." *Brown & Gay Engineering, Inc. v. Olivares*, 461 S.W.3d 117, 121 (Tex. 2015).

*2. Governmental immunity resolves cases, but not on the merits*

As here, a government unit may raise its immunity through a plea to the jurisdiction. *Texas Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 225-26 (Tex. 2004). The function of the plea is "to defeat a cause of action without regard to whether the claims asserted have merit." *Bland Independent School Dist. v. Blue*, 34 S.W.3d 547, 554 (Tex. 2000). But inherent in that principal is Justice Willett's observation that "just as immunity is inherent to sovereignty, unfairness is inherent to immunity." *City of Galveston v. State*, 217 S.W.3d 466, 480 n.38 (Tex. 2007) (Willett, J., dissenting).

*3. The legislature primarily decides when immunity should be waived*

Texas Courts have recognized that the legislature "is best suited to make the policy-laden judgments as to if and how state government resources should be expended." *Bacon*, 411 S.W.3d at 172-73 *citing Texas Dep't of Transp. v. Sefzik*, 355 S.W.3d 618, 621 (Tex. 2011) and *Tooke*, 197 S.W.3d at 331-32. Courts should thus defer to the legislature as the policy-making branch of government "to decide whether and to what extent that immunity should be waived." *City of Galveston*, 217 S.W.3d at 471. And courts have consistently done so. *Reata Const. Corp.*, 197 S.W.3d at 374-75.[7] Thus "[a] political subdivision enjoys governmental immunity from suit to the extent that immunity has not been abrogated by the Legislature." *Ben Bolt-Palito Blanco Consol. Indep. Sch. Dist. v. Texas Political Subdivisions Prop./Cas. Joint Self-Ins. Fund*, 212 S.W.3d 320, 324 (Tex. 2006). "Where a government entity challenges jurisdiction on the basis of immunity, the plaintiff must affirmatively demonstrate the court's jurisdiction by alleging a valid waiver of

---

[7] *Reata* raises one of the few examples of courts defining an exception to governmental immunity. The court there held that when a government entity initiates the litigation process by asserting its own affirmative claims for monetary relief, the defendant can raise claims against that same government entity as an offset. *Reata Const. Corp. v. City of Dallas*, 197 S.W.3d 371, 376-77 (Tex. 2006).

immunity." *Ryder Integrated Logistics, Inc. v. Fayette County*, 453 S.W.3d 922, 927 (Tex. 2015) (internal quotation marks omitted). And governmental immunity is waived only by clear and unambiguous language indicating the legislature's intent to do so. TEX.GOV'T CODE ANN. § 311.034 ("[A] statute shall not be construed as a waiver of sovereign immunity unless the waiver is effected by clear and unambiguous language."); *Hillman*, 579 S.W.3d at 359-60; *Socorro Indep. Sch. Dist. v. Hamilton*, 579 S.W.3d 831, 835 (Tex.App.--El Paso 2019, pet. denied).

### 4. *The doctrine is of such importance that it cannot be waived*

A government unit's immunity implicates a trial court's subject matter jurisdiction. *Engelman Irrigation Dist. v. Shields Brothers, Inc.*, 514 S.W.3d 746, 751 (Tex. 2017). As such we have an obligation to consider the issue even if it was not raised below. *Rusk State Hosp. v. Black*, 392 S.W.3d 88, 91 (Tex. 2012) (argument raised for first time to court of appeals); *Manbeck v. Austin Indep. Sch. Dist.*, 381 S.W.3d 528, 530 (Tex. 2012) (immunity argument raised for first time before Texas Supreme Court).[8]

### B. Application

With these principles in mind, does section 191.173 of the Natural Resources Code unambiguously waive the City's governmental immunity? Section 191.173 is the sole basis for Grossman's claim that he may sue the City. The text of that section authorizes a "citizen of the State of Texas" to bring an action "to restrain and enjoin violations or threatened violations" of the Antiquities Code "and for the return of items taken in violation of the provisions of this chapter." TEX.NAT.RES.CODE ANN. § 191.173(a). While this provision generally authorizes an injunctive suit, our question is whether the legislature has allowed injunctive suits against government

---

[8] Accordingly, the majority correctly rejected, as do I, Grossman's argument that the City waived immunity through a prior claimed judicial admission.

15

entities. We undertake this task understanding that our sister court of appeals has already answered the question "No." *Wolfe*, 578 S.W.3d at 261 ("But even assuming Grossman is entitled to replead to assert claims against the Commission, the jurisdictional defect would remain because the Antiquities Code does not waive the Commission's sovereign immunity."). Grossman reminds us that the Third Court of Appeals' decision is not binding on this Court. Both the majority and I agree on the framework to decide this question. We just disagree on the outcome of the analysis.

### 1. The relevant considerations

Two terms ago, the Texas Supreme Court decided whether provisions of the Michael Morton Act waived a County's immunity from a wrongful discharge claim by one of its prosecutors. In deciding whether the Act "clearly and unambiguously" waived immunity, the court outlined five considerations to answer that question:

(1) "whether the statutory provisions, even if not a model of clarity, waive immunity without doubt";

(2) resolve any "ambiguity as to waiver . . . in favor of retaining immunity";

(3) generally, find waiver "if the Legislature requires that the [governmental] entity be joined in a lawsuit even though the entity would otherwise be immune from suit";

(4) whether the Legislature "provided an objective limitation on the governmental entity's potential liability"; and

(5) "whether the statutory provisions would serve any purpose absent a waiver of immunity."

*Hillman*, 579 S.W.3d at 360, *quoting Harris County. Hosp. Dist. v. Tomball Reg'l Hosp.*, 283 S.W.3d 838, 844 (Tex. 2009). In my view, none of these factors weigh in favor of a waiver of governmental immunity.

16

## 2. Application of the factors

First, the text of section 191.173 does not expressly waive the City's immunity. It makes no explicit reference to a government entity at all. The language is contrasted with other statutory provisions that expressly waive immunity. *See, e.g.*, TEX.GOV'T CODE ANN. § 554.0035 ("Sovereign immunity is waived and abolished to the extent of liability for the relief allowed under this chapter for a violation of this chapter."); *Id.* § 2007.024(c) ("Sovereign immunity to liability is waived to the extent the governmental entity elects to pay compensation under this subsection."); TEX.NAT.RES.CODE ANN. § 52.035(c) ("The state waives its right to claim sovereign immunity in any action commenced against the state for unauthorized disclosure of the confidential information obtained from the Department of the Interior [as per this section]"); *Id.* § 33.171(a) ("A littoral owner whose rights may be affected by any action of the board under this chapter may bring suit for a declaratory judgment against the State of Texas in a district court in Travis County to try the issues."); TEX.CIV.PRAC.& REM.CODE ANN. § 110.008 ("Subject to section 110.006, sovereign immunity . . . from liability is waived and abolished to the extent of liability created by section 110.005[.]"). Consequently, section 191.173 does not "waive immunity without doubt." *Hillman*, 579 S.W.3d at 360.

And although not bound by the decision, I find persuasive the Third Court of Appeals decision in *Bacon*, 411 S.W.3d at 177. The court there answered the same question before us, but as to section 442.012(a) of the Texas Government Code. That section permits "any resident of this state [to] file suit in district court to restrain and enjoin a violation or threatened violation of this chapter or Chapter 191, Natural Resources Code, to recover on behalf of the state a civil penalty provided by this chapter, . . . or for both injunctive relief and a civil penalty." *See* TEX.GOV'T CODE ANN. § 442.012(a). The plaintiff in *Bacon* based his claim against the THC on

17

this provision, contending that the THC approved inaccurate historical markers. The court concluded, however, that the THC was immune from that claim. As the court noted, "[E]ven if section 442.012(a) otherwise authorized Bacon to bring his suit, it would not, as THC emphasizes, waive the sovereign immunity that shields the agency against this or any other claim Bacon brings against it." *Bacon*, 411 S.W.3d at 177. The court reached this conclusion, reasoning the section 442.012 did not clearly and unambiguously waive immunity. Like our statute, section 442.012 does not expressly mention suing a government entity. The *Bacon* court also compared the statute to those that merely permit the state to "sue or be sued" or to "plead or [be] impleaded," noting that even such statutory language by itself is not sufficient to waive sovereign or governmental immunity. *Id.*, *citing Tooke*, 197 S.W.3d at 342.[9]

The second and third considerations also weigh against Grossman. If there is a doubt (and there is here), then that doubt is resolved against a waiver. This factor mirrors the allocation of burdens: Grossman carries the burden to demonstrate that the trial court has subject-matter jurisdiction over his claims. *Dallas Area Rapid Transit v. Whitley*, 104 S.W.3d 540, 542 (Tex. 2003); *City of El Paso v. Waterblasting Technologies, Inc.*, 491 S.W.3d 890, 895 (Tex.App.-- El Paso 2016, no pet.). As to the third consideration, the Natural Resources Code does not require

---

[9] As the court noted in *Tooke*:

> Scores of Texas statutes provide, variously, that individuals and entities, public and private, may "sue and (or) be sued", "(im)plead and (or) be impleaded", "be impleaded", "prosecute and defend", "defend or be defended", "answer and be answered", "complain and (or) defend", or some combination of these phrases, in court. . . . Because immunity is waived only by clear and unambiguous language, and because the import of these phrases cannot be ascertained apart from the context in which they occur, we hold that they do not, in and of themselves, waive immunity from suit.

*Tooke*, 197 S.W.3d at 328.

the joinder of any public entity into an injunction action. Section 191.173 says nothing at all about who must be a party to the action.

Because section 191.173 only allows for injunctive type relief, it at least arguably limits a public entities liability if suit is filed. This fourth factor might superficially weigh in Grossman's favor and is the factor that the majority partly hangs its hat on. But as the expanse of this litigation suggests, even a claim that does not seek monetary relief can tax a public entity's resources. In the nine years that the litigation surrounding the project has dragged on, we would be blind to not acknowledge that the costs of delay and litigation to the City are substantial. Setting aside the legal fees, the costs of labor, material, and real estate to complete the Arena have no doubt risen. *See Buckholts Indep. Sch. Dist.*, 632 S.W.2d at 149 (noting that the mere existence of a suit contesting a public project bond is likely to cause damages, including from increased construction costs); *Hotze v. City of Houston*, 339 S.W.3d 809, 815 (Tex.App.--Austin 2011, no pet.) (upholding constitutionality of bond requirement and amount of bond in challenge to public works bond based on costs of delay, including increased costs related to re-bidding contracts and inflation). We would also be naïve to assume that delays occasioned by temporary injunction litigation do not affect the cost of financing for the City. If the Arena is ever built, it may be appreciably more expensive than as originally planned, or at least would need to be scaled back to fit the original budget. And any delay in constructing the Arena would equate to lost revenue for the events that could not be booked there. Simply because Grossman has not sought monetary relief does not mean that he is not exacting a substantial cost to the City.

The parties largely join issue on the last consideration--whether section 191.173 would apply to anyone other than a government entity. Stated otherwise, "we must look at whether a statute makes any sense if immunity is not waived." *Kerrville State Hosp. v. Fernandez*, 28 S.W.3d

19

1, 6 (Tex. 2000). Grossman's argument claims that because the Antiquities Code primarily applies to projects on public lands, it necessarily involves government entity defendants, and the injunction remedy was necessarily intended to waive immunity. And true enough, section 191.0525 requires the issuance of a permit for any project located "on state or local public land[.]" TEX.NAT.RES.CODE ANN. at § 191.0525(a). But that provision does not necessarily mean that the party constructing the improvement is also a public entity. There are any number of situations where a private entity could be constructing facilities on public lands (and consequently the injunction provision could be directed at such private entities). The notice requirement in section 191.0525 contains a list of sixteen categorical exclusions, several of which would implicate private, and not public entities. *Id.* § 191.0525(e)(1)(14)(15) (oil and gas wells activities); (2) (upgrading electrical lines); (8) (animal grazing); and (9) (plowing). Had the Code been designed solely to restrain construction by or on behalf of public entities, there would have been no need to exclude what are typically considered private commercial activities.

Nor is it a given that all construction on public lands is performed by public entities. In 2011, the legislature enacted a comprehensive set of provisions authorizing public private partnerships that would permit a private entity to construct for the benefit of a public entity qualifying projects, which might include, among others, facilities for mass transit, vehicle parking, port, power generation, fuel supply, water supply, medical or nursing care or recreation. Also included are oil or gas pipelines, hospitals, and schools. TEX.GOV'T CODE ANN. §§ 2267.001-2267.066; 2267.001(10) (defining qualifying projects); § 2267.056 (authorizing conveyance of interests in public lands); § 2267.057(a)(2) (authority of qualifying person to develop project). Even prior to that enactment, several statutes authorized public entities to lease their land to private entities for commercial development. TEX.REV.CIV.STATS.ANN. art. 5421c § 8-A (State land

20

subject to lease for recovery of oil and gas); TEX.NAT.RES.CODE ANN. § 51.121 (unsold public school land may be leased for any purpose that is in the best interest of the state); TEX.EDUC.CODE ANN. § 65.39 (UT regents' authority to lease its lands); *Walker v. City of Georgetown*, 86 S.W.3d 249, 252 (Tex.App.--Austin 2002, pet. denied) (example of private entity building and operating a batting cage in a public park owned by the city); *Zachry v. City of San Antonio*, 305 S.W.2d 558, 559 (Tex. 1957) (example of city's attempted lease of portion of public park for construction of parking garage). Accordingly, section 191.0525 could well apply to a private entity constructing improvements on public lands.

Moreover, the Antiquities Code has other provisions that implicate private parties. Section 191.054 contemplates the THC issuing permits to state agencies, political subdivisions "or to qualified private institutions, companies, or individuals for the survey and discovery, excavation, demolition, or restoration of, or the conduct of scientific or educational studies at, in, or on landmarks, or for the discovery of eligible landmarks on public land[s.]" TEX.NAT.RES.CODE ANN. § 191.054(a). Landmarks can, pursuant to the limitations in the Code, be designated on private lands. *Id*. § 191.054-191.098. Moreover, section 191.058 details how qualified private parties can display artifacts and other items through permanent exhibits. *Id*. § 191.058(a). Additionally, section 191.053 contemplates contracts with "private institutions, corporations, or individuals for the discovery and scientific investigation of sunken or abandoned ships[.]" *Id.* § 191.053.[10] The injunction provision in section 191.173 could just as well apply to a private salvage company exploiting such a shipwreck. Nor is it hard to envision how section 191.173

---

[10] TEX.NAT.RES.CODE ANN. § 191.091 ("Sunken or abandoned pre-twentieth century ships and wrecks of the sea, and any part or the contents of them, and all treasure imbedded in the earth, located in, on, or under the surface of land belonging to the State of Texas, including its tidelands, submerged land, and the beds of its rivers and the sea within jurisdiction of the State of Texas, are declared to be state archeological landmarks and are eligible for designation.").

might be useful in preventing private parties from interfering with landmarks on private land, or protecting artifacts held for display by private parties. In fact, section 191.173 well fits those situations in that it expressly authorizes "the return of items taken in violation of the provisions of this chapter." *Id*. § 191.173(a).

Because there are applications of section 191.173 that extend beyond public works projects administered by government entities on public lands, the provision serves other "purpose[s] absent a waiver of immunity." *Tomball Reg'l Hosp.*, 283 S.W.3d at 844; *see also Hillman*, 579 S.W.3d at 360 (rejecting similar argument because Michael Morton Act served purpose "separate and apart" from wrongful termination claims).

In sum, the balance of the considerations outlined in *Hillman*, should inform us that section 191.173 is not a clear and unambiguous waiver of governmental immunity.

### 3. Governmental immunity does not defang the Antiquities Code

Nor does the existence of governmental immunity prevent the Antiquities Code from accomplishing its purpose. "[W]hile governmental immunity provides broad protection to the state and its officers, it does not bar a suit against a government officer for acting outside his authority—*i.e.*, an *ultra vires* suit." *Houston Belt & Terminal Ry. Co. v. City of Houston*, 487 S.W.3d 154, 161 (Tex. 2016). That claim prevents a state officer from acting "without legal authority or fail[ing] to perform a purely ministerial act." *Heinrich*, 284 S.W.3d at 372. That is, *ultra vires* suits "attempt to reassert the control of the state" over overreaching government officials and "encourages enforcement of existing policy." *City of Houston*, 487 S.W.3d at 164.

So, when the City here first proceeded to begin the Arena project without notifying the THC, its officials subjected themselves to an *ultra vires* claim for failing to perform the ministerial act of complying with the notice provisions of the Antiquities Act. And once the THC was

22

involved, its officers were subject to *ultra vires* claims if they acted without legal authority or failed to perform a ministerial duty. That is what Grossman in fact claimed when he sued Director Wolfe in the *Wolfe* suit.

No doubt, an *ultra vires* claim does not permit a litigant to challenge the valid exercise of a government official's discretion (such as the Austin Court of Appeals concluded in the *Wolfe* suit). In *City of Houston*, the court explained the distinction between the type of discretion which might be raised in an *ultra vires* suit, and that which cannot:

> Accordingly, the principle arising out of *Heinrich* and its progeny is that governmental immunity bars suits complaining of an exercise of *absolute* discretion but not suits complaining of *either* an officer's failure to perform a ministerial act *or* an officer's exercise of judgment or *limited* discretion without reference to or in conflict with the constraints of the law authorizing the official to act. Only when such absolute discretion—free decision-making without any constraints—is granted are *ultra vires* suits absolutely barred. And, as a general rule, "a public officer has no discretion or authority to misinterpret the law." *Cf. In re Smith*, 333 S.W.3d 582, 585 (Tex. 2011) (orig. proceeding).

*City of Houston*, 487 S.W.3d at 163 (emphasis original).

This case does not come to us an *ultra vires* claim, either against the City or THC. The point, however, is that even with the limitations imposed by governmental immunity, aggrieved litigants are not without recourse to enforce the Antiquities Code against government actors for actions clearly in derogation of the Act. What they cannot do, however, is to have a court second guess the THC's discretion to approve the technical formulation of an archeological dig.

## III. THE TRIAL COURT DID NOT ERR IN DENYING THE TEMPORARY INJUNCTION

On the merits, Grossman carries the burden to show that the trial court abused its discretion in failing to find the three elements for a temporary injunction: (1) his legal right to relief; (2) a probable right for recovery; and (3) a probable, imminent, and irreparable injury if the relief is not granted. *Butnaru v. Ford Motor Co.*, 84 S.W.3d 198, 204 (Tex. 2002). For the first two elements,

23

the thrust of his argument is that the current design of the archeological survey is inadequate to locate and protect the remnants of the Peace Camp, which in the intervening centuries has been covered with as much as 20 feet of sediment. The City contested this claim and offered its own expert to defend the current archeological research design. Faced with conflicting testimony, the trial court resolved the dispute against Grossman. On the merits, I agree with the City that our standard of review precludes the relief that Grossman seeks.

The majority opinion acknowledges our standard of review, but in my view fails to properly apply it. The trial court was vested with the discretion to grant or deny the temporary injunction. *Id.* at 204. We can overturn its decision only upon a showing that the trial court abused that discretion. *Id.*; *State v. Walker*, 679 S.W.2d 484, 485 (Tex.1984). We cannot find an abuse of discretion without a showing that the trial court's action was so arbitrary that it exceeded the bounds of reasonable discretion. *Johnson v. Fourth Ct. of Appeals*, 700 S.W.2d 916, 918 (Tex. 1985). Moreover, when the trial court does not make findings of fact or conclusions of law, we must uphold the court's order on any legal theory supported by the record. *Yardeni v. Torres*, 418 S.W.3d 914, 918 (Tex.App.--El Paso 2013, no pet.). The trial court sits as fact finder and has the discretion to believe or disbelieve a witness's testimony; we may not disturb that finding so long as it falls within the "zone of reasonable disagreement." *Yardeni*, *quoting City of Keller v. Wilson*, 168 S.W.3d 802, 822 (Tex. 2005) ("A reviewing court cannot substitute its judgment for that of the trier-of-fact" where facts are disputed).

Simply put, the dispute below outlines two strategies for conducting an archeological survey. Both sides acknowledge that there may have been a "Peace Camp" within the footprint of the Arena project. And both sides agree to the importance of preserving any artifacts that might be still found there. What they disagreed upon what how go about doing the survey.

24

Grossman asks that the project be stayed until the City implements a "research design . . . that properly accounts for the existence of the peace camp in Duranguito." The City's current plan, however, was not developed in a vacuum, as its Scope of Work had to be approved by the THC, as evidenced by a duly issued permit. Under the statute, the THC can issue that permit when, in "the opinion of the committee" the "permit is in the best interest of the State of Texas." TEX.NAT.RES.CODE ANN. § 191.054(a). That language certainly vests the THC with a broad discretion, which courts should ordinarily be loath to second guess:

> If the matter covered by the order is one committed to the agency by the Legislature, and involves the exercise of its sound judgment and discretion in the administration of the matter so committed to it, the court will not undertake to put itself in the position of the agency, and determine the wisdom or advisability of the particular ruling or order in question, but will sustain the action of the agency so long as its conclusions are reasonably supported by substantial evidence. This is so because, since the Legislature has seen fit to vest the authority to exercise sound judgment and discretion in the particular matter in the administrative agency, courts will not undertake to usurp the powers committed to the agency, and to exercise the agency's judgment and discretion for it.

*Railroad Comm'n v. Shell Oil Co.*, 161 S.W.2d 1022, 1029 (Tex. 1942).

Although Grossman argues that the current design does not comply with the statute, his claims are long on rhetoric, but short on details. Grossman's experts disputed the methodology of using the ground penetrating radar, and the size of the screens used to sieve the soil. But not even the majority finds these claims substantial enough to ground its decision. Moreover, these were technical ladened questions which were resolved against Grossman. Another specific claim is that a proper research design apparently would require the City to send its consultants to physically examine the archival materials referenced in Santiago's book and consult with local experts. But no specific part of the statute, or the THC's internal rules require that as a part of a proper research design. At the end of the day, we are left with the claim that the current Scope of Work does not account for the peace camps, but I believe the evidence below on this central point was hotly

25

disputed, and it is far from clear that the City has not already accounted for the possibility of a peace camp in the Arena's footprint.

The City relies on the testimony of Douglas Mangum who was responsible for the "research design" and "scope of work" submitted as part of the permit application.[11] His revised Scope of Work describes a phased plan that includes:

> **Phase 1a.  Remote Sensing Survey**.  This phase describes the use of GPR in open areas, such as streets, parking lots and sidewalks.  As buildings are demolished to ground level, their footprint will also be surveyed by GPR, until 100% of the Arena footprint is examined.  "Upon the conclusion of the remote sensing survey, an interim report will be prepared that summarizes the key findings."  The interim report will be submitted for review and comment to the City and then to the Archeology Division of the THC, for the purpose of formulating a plan to mechanically survey the area.
>
> **Phase 1b.  Archeological Monitoring of Building Demolition**.  This phase is intended to ensure that the demolition of existing buildings will be conducted in a way so as to not impact deposits beneath the structures and pavements. It includes onsite inspection by archeologists and guiding the machine operators doing the demolition.  It also includes stopping work if any "artifacts or features related to any historic/prehistoric sites are inadvertently exposed by this process."
>
> **Phase 2.  Mechanical Survey of the Project Area.**  This phase describes the methodology for shallow scraping and trenching and exploratory trenches "situated in strategic locations (e.g., archival high priority areas and GPR anomalies)."  "Each trench excavation will be monitored by a crew of at least two professional archeologists, who will conduct the screening and who will record all findings from each trench."  Moore contemplated 35 to 50 trenches, "[h]owever, these numbers will likely vary depending on the result of the GPR survey and conditions on the ground as they are encountered."
>
> Following the mechanical survey, Moore would prepare a technical report that details the results and makes recommendations regarding the need for any additional work.  "The goal of this phase of work is to identify and record sites, and as feasible based on Phase 1 and 2-level efforts, make recommendations regarding the possible need for additional investigation.  As a result, more intensive excavation, if necessary, will take place following reporting of the Phase 1 and 2 results and findings, and coordination of these findings with the THC.  Any archaeological discoveries made during this phase will be evaluated and compared against available historical or archival information."

---

[11] Mangum obtained a bachelor's degree in anthropology with a concentration in archaeology.  He obtained a master's degree in history.  His firm was hired as the cultural resource management firm for the Arena project.  He has worked for the firm for almost 19 years.  No challenge was made below to his qualifications to offer expert opinion.

**Phase 3. Future Phases of Work.** This phase including developing an inventory of sites in the footprint that are possible landmarks and providing recommendations to the THC about the status of these sites.

Grossman challenged this research design first by submitting his expert's opinions as an attachment to a letter served on the THC. The letter asked for a redesign of the scope of work based on the Mark Santiago book describing the peace camp. The THC did not require a redesign of the scope of work. It did, however, send Mangum a letter that asked his firm to "familiarize" itself with the Santiago book and "consider the potential for encountering cultural deposits associated with the peace camp" during the investigations. Mangum agreed that he would follow the THC's recommendation and testified that he has read or skimmed through Santiago's book multiple times.

But even as early as the original scope of work, Mangum had already recognized the potential for Apache artifacts:

Q. And what specific provisions did you make to cover that potential?

A. We recognize that there's potential for Apaches in the area, and in both the research design and in the scope, we specifically discuss what we will do and what potential there is for prehistoric and Native American finds on the site.

. . .

Q. Now, the letter that we previously discussed, which is Exhibit 9, have you considered the potential for encountering cultural deposits associate with a peace camp?

A. Yes.

Q. And what considerations have you come up with?

A. It's actually pretty much the same thing that we have always done, which was that the potential for prehistoric and Native American remains have always been a high priority for us on this project. It was in fact the first context that we named as an important potentially -- potentiality on this site. And so if we encounter them, if we encounter any Native American remains, then the first consideration with this data will be the potential for the peace camps.

Q. So you are not making any changes to your scope of work at this point, you're not recommending anything be done to change it?

27

A. The THC has not asked us to.

. . .

Q. Sure. The letter here says that we recommend that you familiarize yourself with Mr. Santiago's work, Santiago's work, and consider the potential for encountering cultural deposits associated with a peace camp during your investigations, and I asked you are they requiring you to do anything specific to encounter the peace camps?

A. They are not because it is already written into the scope of work that we will be doing so. . . .

Q. I'm asking you whether your scope of work contains a systematic plan to uncover Mescalero Apache remains from the peace camp area.

A. It contains specific plans for how we will deal with Native American remains. And the THC, in their letter reinstating our permit, did not require us to be specific, just to be aware of and be mindful of that potentiality.

Grossman argued below that the Scope of Work would only go down as far as the footings on the Arena structure. Mangum's testimony shows that argument is demonstrably false. Mangum had reviewed several historical maps to plot the likely location of the Rio Grande's changing riverbed, but he acknowledged the depth of sediment deposits could only be theorized at this point. He believes any remains for a peace camp "could be shallow, it could be fairly deep, but it would almost certainly . . . would still be well within what we anticipate probably having to excavate as part of our work." Ultimately, the depth of excavation cannot be determined until the process actually starts:

Q. All right. And it is clear then -- are you being clear with me that in September -- on September 27th, the date of the revised scope of work, you did not know exactly how deep you would go?

A. No, I did not. It's not always essential at this phase because the work that we're doing is preliminary. We are -- the Phase 2 is intended as an exploratory and then we will determine whether we need to go deeper. It is always possible, and this happens on a regular basis, that in our initial investigations, we reach a depth at which it's clear that there's no potential for human occupation for one reason or another. And so we do not always plan on excavating as deep as -- as everything will go unless we need to.

Q. All right. And what determines if you need to?

28

A. The results that we find as we go down, as we dig down.

Q. And if you reach a find, does that mean you continue to go down below that?

A. [It] really depends on the methodology that we're using. Typically if something like this, if we find something at a depth and we think it needs more under -- that we need to do more investigating on that, then at least in the area of that find, pardon me, we will stop digging deeper and start digging broader to investigate what we're finding there.

Q. So these are judgments you're making along the way?

A. Yes.

Grossman also claims that the City has no specific plan to account for the peace camps. But Mangum also described the details of the City's plan:

Q. Okay. And what is the systematic plan, then?

A. We will investigate any Native American remains, cultural remains, physical remains that we find.

Q. And what is the system to do that? What is the plan to do that?

A. We will go into Phase 2 mode. We will start clearing the living surfaces that we encounter. We will identify each and every artifact as it is exposed in place. We will do analysis of those artifacts. We will determine, based on that analysis, what groups, what times they lived there.

We will take samples, including potentially radiocarbon dates so that we can identify specific times. We will essentially conduct an entire archaeological investigation of each layer that we encounter that has historic or prehistoric cultural remains.

Nor do I find persuasive the criticism that the present plan was inflexible. The Scope of Work already outlined how Moore would provide interim reports for the THC which would guide further actions.

The THC, which has primary expertise and responsibility in this area has agreed with the City's plan. So too did the trial judge who heard the evidence (at least in the sense that Grossman did not meet his burden). Usually, we accord deference to an administrative agency acting within its discretion and area of expertise. *E.g.*, *Shell Oil Co.*, 161 S.W.2d at 1029. And usually when a trial court record contains conflicting evidence, we accord discretion to the fact finder (who had

29

the opportunity to actually see and hear the live testimony). *See Furr's Supermarkets, Inc. v. Bethune*, 53 S.W.3d 375, 379 (Tex. 2001) ("A trial court does not abuse its discretion if some evidence supports the trial court's decision."); *Davis v. Huey*, 571 S.W.2d 859, 862 (Tex. 1978) ("An abuse of discretion does not exist where the trial court bases its decision on conflicting evidence."). Because the Court has done neither here, I respectfully dissent. On the key point--whether the existing scope of work already accounts for the potential of a peace camp--the evidence was at most conflicting, and a reasonable fact finder could have well found that Mangum persuasively outlined a flexible plan for accounting for all historical finds, including the peace camp.

## IV. CONCLUSION

Anyone walking Boston's "Freedom Trail" has no doubt marveled at the 17th century wood and brick structures nestled between the glass and steel skyscrapers that define the city's skyline. Still preserved to this day are the Boston Commons (America's oldest public park), the Old South Meeting House (where the Boston tea party began), Faneuil Hall (where Sam Adams rallied the cause of independence and George Washington toasted the nation's first birthday), Paul Revere's House, and the Old North Church (heralding warnings of British troop movements). Generations of Bostonians have no doubt resisted the urge to replace these historic places and structures with more utilitarian or lucrative uses for the prime real estate. And as beneficiaries of their foresight, we are still able to see many of the buildings and places where our Republic was born.

But to my research, the decisions to save these landmarks were fought out in the political arena, and not imposed on the City by its judiciary. Today, we have armed the loser in a political battle over the Arena with a powerful weapon to delay and likely kill a project that prevailed in

30

the ballot box.  And in doing so, we have created a conflict in the courts of appeals over whether section 191.173 waives sovereign immunity.  For these reasons, I dissent.

JEFF ALLEY, Justice

November 10, 2021

Before Rodriguez, C.J., Palafox, and Alley, JJ.

31